UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

:

DANDONG OLD NORTH-EAST         :
AGRICULTURE & ANIMAL HUSBANDRY  :
CO., LTD.,                              :

                       :

                 Plaintiff,   :       17 Civ. 4571 (KPF)

                       :

          v.           :      OPINION AND ORDER

                       :

PASTERNAK BAUM & CO., INC,       :
COLUMBIA GRAIN TRADING INC. and    :
WILLIAM C. GALLO,               :

                       :

             Defendants. :

                       :

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  March 19, 2018

KATHERINE POLK FAILLA, District Judge:

      In a case that is reminiscent of a first-year contracts exam, Plaintiff

Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd. seeks to

enforce a purported settlement agreement and, potentially, to revivify an earlier

litigation that Defendants Pasternak Baum & Co., Columbia Grain Trading,

Inc., and William Gallo believed to be resolved.  In an earlier matter before this

Court, Plaintiff brought civil claims against Defendants and others under the

Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C.

§ 1962, and various tort theories to recover monies misappropriated by Gary

Ming Hu, a rogue former employee of both Plaintiff and Defendants.  This was

not the first time these parties had litigated the consequences of Hu's

malfeasance, for which he is now incarcerated in China, but they hoped it

would be the last.  Toward that end, Defendants accepted Plaintiff's offer to

Case 1:17-cv-04571-KPF    Document 2    04/17/2018    2283745    Page 2 of 23

discuss settlement. A written agreement (the "Agreement") was executed, and on February 15, 2017, the Court dismissed Plaintiff's claims against Defendants with prejudice.[1]

Very soon after its execution, the parties evinced markedly different understandings of the Agreement. After devoting considerable time to poring over the Agreement, the Court understands why. The plain language of the Agreement is internally inconsistent, to the point that it forecloses a finding that the parties mutually assented to its material terms. Plaintiff has filed an Order to Show Cause why the Court should not enter an order of specific performance directing Defendants to comply with the terms of the Agreement as Plaintiff interprets them. The Court cannot, and for the reasons that follow, Plaintiff's application is denied.

## BACKGROUND[2]

### A.    Factual Background

#### 1.    The Civil RICO Action

Plaintiff filed its Complaint in *Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd.* v. *Pasternak Baum & Co.*, No. 15 Civ. 10015 (KPF)

---

[1]    The Agreement was not submitted to the Court at the time.

[2]    This Opinion draws primarily from the terms of the Agreement. The Court also considers, to the extent it is able as discussed below, facts alleged in the Declaration of Harold Ruvoldt in Support of Plaintiff's Motion for an Order to Show Cause (Dkt. #9 ("Ruvoldt Decl.")), and the exhibits attached thereto; the Declaration of Michael Chalos in Support of Defendants' Response to Plaintiff's Motion for an Order to Show Cause (Dkt. #25 ("Chalos Decl.")), and the exhibits attached thereto; and the Reply Declaration of Harold Ruvoldt in Support of Plaintiff's Motion (Dkt. #29 ("Ruvoldt Reply Decl.")), and the exhibits attached thereto. Plaintiff's memorandum of law in support of its motion is referred to as "Pl. Br." (Dkt. #10), Defendants' opposition is referred to as "Def. Opp." (Dkt. #24), and Plaintiff's reply is referred to as "Pl. Reply" (Dkt. #28). The Court also draws facts from the Complaint filed in *Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd.* v. *Pasternak Baum & Co.*, No. 15 Civ. 10015 (KPF) (15 Civ. 10015

("*Dandong I*"), on December 23, 2015, against Columbia Grain Trading, Inc. ("CGTI"), Pasternak Baum & Co. ("Pasternak"), William C. Gallo (President of CGTI and Chief Executive Officer of Pasternak), Gary Ming Hu, Hu's wife Yuhua Wang, and Hu's daughter Esther Hu Mangan. (2015 Compl.). The facts underlying the litigation are recounted in detail in the Court's August 3, 2017 Opinion and Order dismissing Plaintiff's claims as to Defendants Wang and Mangan, *Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd.* v. *Pasternak Baum & Co.*, No. 15 Civ. 10015 (KPF), 2017 WL 3328239, at *1-4 (S.D.N.Y. Aug. 3, 2017), and are summarized here in relevant part for context.

Plaintiff is a soybean oil and meal manufacturer in China, and is one of the largest purchasers of soybeans grown in the United States. (2015 Compl. ¶ 5). Hu worked for Plaintiff from 2008 to 2010 as its Executive Director and General Manager and, during that same time period, was also an agent or employee of Defendants Pasternak and CGTI — a fact that he allegedly concealed from Plaintiff. (*Id.* at ¶¶ 6, 8, 50). Because of the frequent fluctuations in the price of soybeans, contracts for soybeans "set[] a pricing process" wherein the contracts "provide[] alternatives for the price of the soybeans" — a premium price and an optional price. (*Id.* at ¶¶ 27-28). Plaintiff alleged that the price had been inflated in 23 soybean contracts (the "Soybean Contracts"). (*Id.* at ¶ 42). More pointedly, Plaintiffs alleged that Hu, together with Defendants in this action, schemed to "manipulate[] the terms in each of

---

Dkt. #1) of which it may take judicial notice, and refers to it in this Opinion as the 2015 Complaint or "2015 Compl."

these [soybean] contracts so that the soybean prices, and thus profit, were significantly higher than the market price." (*Id.* at ¶ 43). Consequently, Plaintiff believes that it overpaid Defendants for soybeans to the tune of "millions of dollars." (*Id.*).

Plaintiff brought nine claims for, *inter alia*, civil RICO violations and common-law torts. (2015 Compl. ¶¶ 122-91). Plaintiff sought to recover compensatory damages, "including all monies due Dandong ... caused by diversion, inflation and improper charges of fees, costs of investigation by accountants and attorneys," treble damages under RICO, punitive damages, fees, and costs. (*Id.* at ¶ 191). The 2015 Complaint referenced specific amounts Plaintiff believed it had lost with respect to certain of the Soybean Contracts. For example, and as relevant here, Plaintiff alleged it was owed $1,411,163.18 in damages for "fraudulently-obtained profit" on Soybean Contract number 30007/A. (*Id.* at ¶ 60(a)). Plaintiff further alleged that "[a]t the conclusion of [23 specified] transactions ... Dandong ... was entitled to refunds on payments made totaling in excess of USD $10.877 million," and that Hu had caused "at least USD $8,735,684.91 to be wired to bank accounts ... owned by persons and companies designated by Gary Hu, thus diverting the funds from their rightful owner, Dandong[.]" (*Id.* at ¶¶ 45, 82).

Following the filing of the 2015 Complaint, counsel for Defendants entered an appearance and requested additional time to respond in light of the complexity of the allegations. (15 Civ. 10015 Dkt. #21). The Court gave Defendants until April 25, 2016, to answer or otherwise respond. (15 Civ.

10015 Dkt. #22).  On April 21, 2016, Defendants were again given additional time to answer, this time until June 20, 2016.  (15 Civ. 10015 Dkt. #38).  On June 2, 2016, Defendants' counsel sent an email to Plaintiff's counsel attaching a memorandum of law in support of a threatened motion for sanctions under Federal Rule of Civil Procedure 11, on the basis that "material elements of factual and legal allegations in [the 2015] Complaint are without legal or factual basis[.]"  (Chalos Decl., Ex. 5).  Defendants' counsel announced that "unless the issues described in the [m]emorandum are properly addressed," Defendants would proceed to file the motion.  (*Id.*).

Two weeks later, on June 17, 2016, Defendants wrote to the Court seeking leave to file a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (*see* 15 Civ. 10015 Dkt. #44), citing three bases for dismissal:  *First*, Defendants argued that the claims were barred under principles of *res judicata* because of a prior litigation in China against CGTI and others in which Plaintiff recovered $7,142,196.82 in a settlement and $3,735,684.10 in a final judgment.  (*Id.*).  Defendants noted that "[t]he total amount of the settlement and the judgment — $10,877,880.92 — is identical to the 'excess of $10.877 million' claimed in the Complaint."  (*Id.*).  *Second,* Defendants argued that the RICO and common-law claims were time-barred based on the respective four-year and two-year statutes of limitation.  (*Id.*).  *Third*, Defendants argued that the Complaint failed to plead fraud as a RICO predicate with the particularity required under Federal Rule of Civil Procedure 9(b) and failed to plead the

5

requisite elements of Chinese law in its common-law claims, as required by New York's choice-of-law rules.  (*Id.*).

Shortly thereafter, on June 30, 2016, the Court held a pre-motion conference with the parties regarding Defendants' proposed motion to dismiss, at which the Court expressed skepticism at certain of Plaintiff's claims, particularly in light of the Supreme Court's holding in *RJR Nabisco, Inc.* v. *European Community.*, that "a civil RICO plaintiff [must] allege and prove a domestic injury to business or property and [may] not … recover[] for foreign injuries."  136 S. Ct. 2090, 2111 (2016).  (*See, e.g.*, Dkt. #59 (Transcript) at 5:6-14).  The Court granted Plaintiff leave to file an amended complaint addressing these issues by September 9, 2016.  (Dkt. #49).  On September 7, 2016, Plaintiff sought and received an extension of the time to file its amended complaint until November 18, 2016.  (Dkt. #66).

According to Defendants, Plaintiff approached their counsel on November 7, 2016, to broach the topic of settlement.  (Chalos Decl. ¶ 33).  On November 18, 2016, Plaintiff filed an amended pleading.  (15 Civ. 10015 Dkt. #68).  The same day, the Court received a letter from Plaintiff "to advise the Court that [Plaintiff, CGTI, Pasternak, and Gallo] ha[d] reached a settlement in principle," and to request that the Court enter a conditional order of dismissal and permit Plaintiff time to amend the complaint once more to remove Defendants from the pleadings.  (15 Civ. 10015 Dkt. #67).  The Court directed Plaintiff to file a revised pleading by November 28, 2016, and a stipulation of dismissal within 30 days.  (15 Civ. 10015 Dkt. #69).  On November 28, 2016,

Plaintiff filed a revised Amended Complaint that named as defendants Hu, Wang, Mangan, and various John Does, and omitted CGTI, Pasternak, and Gallo.  (15 Civ. 10015 Dkt. #73).

On December 19, 2016, the parties sought and obtained an extension of the time to file a stipulation of dismissal until December 27, 2016.  (15 Civ. 10015 Dkt. #77).  The parties later called Chambers to inquire about the possibility of a settlement conference.  (*See* 15 Civ. 10015 Dkt. #82).  On January 4, 2017, the parties advised the Court that a conference would not be necessary and a stipulation of dismissal would be forthcoming.  (*Id.*).  The Court then ordered the parties to file a stipulation by February 1, 2017, and on that day the Court received a letter from Plaintiff's counsel attaching a signed stipulation of dismissal but noting that the settlement agreement had yet to be signed.  (15 Civ. 10015 Dkt. #85).  On February 15, 2017, the Court received a letter withdrawing the February 1, 2017 stipulation of dismissal and attaching a new one, which the Court signed on February 15, 2017.  (15 Civ. 10015 Dkt. #86-87).

*Dandong I* continued as to defendants Wang and Mangan, and the Court dismissed Plaintiff's claims against them on August 3, 2017 — to be clear, well after the disputes underlying the instant litigation.  2017 WL 3328239, at *15. Hu has yet to be served with the 2015 Complaint.  (15 Civ. 10015 Dkt. #97).

### 2.    The Settlement Agreement

The Agreement recites that it "fully, finally, and forever resolves all disputes between" Plaintiff and Defendants, while specifically providing that

7

Plaintiff could continue to prosecute the 2015 Complaint against Hu, Wang, and Mangan.  (Agreement ¶¶ 1, 6).  It defined the parties' "disputes" as:

> including but not limited to any claims arising out of or in connection with the Soybean Contracts, the alleged conduct of Gary Hu, the business relationship between the Parties, or any of the allegations relating to the Settling Defendants[3] contained in the Complaint, Amended Complaint, and/or Second Amended Complaint, or in any other proceeding that may result from the continued pursuit of claims by [Plaintiff] against Gary Hu and others, in accordance with the terms, conditions, and representations set forth herein.

(*Id.* at ¶ 1).  The Agreement further provided that the parties would (i) execute a stipulation of dismissal of the 2015 Complaint against Defendants and (ii) mutually release one another from claims "related to those arising out of or in connection with the Soybean Contracts, the conduct of Gary Hu, the Parties' business relationship, or any allegations" in the pleadings.  (*Id.* at ¶¶ 2, 4-5).  Specifically, Plaintiff agreed to release Defendants from, *inter alia*, "all known and unknown charges, complaints, claims, ... liabilities, obligations, contracts, ... damages, ... costs, [and] losses[.]"  (*Id.* at ¶ 4).

Paragraph 6 of the Agreement permitted the litigation to continue against Hu, Wang, and Mangan, but made clear that Plaintiff "shall in no way allege in any pleadings ... in the ongoing action against [Hu, Wang, and Mangan] ... or in any other legal action or arbitration proceeding ... that [Defendants] or any [related entities] were knowing participants in a RICO Enterprise, or in any

---

[3]     "Settling Defendants" is defined to include CGTI, Pasternak, and Gallo.  (Agreement 1).

wrongdoing." (Agreement ¶ 6).  The Agreement also contained an express

disclaimer of any liability as to the allegations made in the 2015 Complaint:

> The Parties acknowledge that this Agreement (and any
> part thereof) is not, and may not be construed as, an
> admission of liability or wrongdoing by any Party[.] …
> All Parties specifically disclaim and deny engaging in
> any wrongful, tortious or unlawful activity in connection
> with the business between them and the Soybean
> Contracts or otherwise.

(*Id.* at ¶ 13).

Of central importance here, Paragraph 7 of the Agreement — titled

"Meeting of Designated Accountants" — states, in relevant part:

> On March 15, 2017 or at such other time as may be
> mutually agreed to by the parties, the designated
> accountant(s) of Pasternak and CGTI shall meet with
> the designated accountant(s) of Dandong[.] … The
> purpose of this meeting shall be to review and determine
> if any moneys are owed to or from any of the corporate
> Parties hereto (i.e., CGTI, Pasternak, and/or Dandong)
> related to their business relationship concerning the
> Soybean Contracts, taking into account any and all
> payments made to date between the Parties.
>
>            ***
>
> b.  The designated accountants shall complete the
> review and determine if any monies are owed to or from
> any of the corporate Parties within two … months of the
> commencement of such meetings[.]
>
>            ***
>
> d.  In the event that the designated accountants are not
> able to reach an agreement as to what monies, if any,
> are owed to or from the corporate Parties, pursuant to
> Paragraph 7(b), then the Parties shall jointly select an
> independent, third-party accountant to review the
> relevant records.  The determination of such third-party
> accountant shall be final[.] … The determination of the

9

designated accountants or third-party accountant shall
be final and not reviewable in any forum.

(Agreement ¶ 7).  Finally, the Agreement contains a standard merger clause
that recites that it represents the "entire agreement and understanding of the
Parties and supersedes all prior negotiations and/or agreements … written or
oral[.]"  (*Id.* at ¶ 15).[4]

### 3.    The Accountants' Meeting

Shortly after the Agreement was executed, it became clear that the
parties' views of their obligations thereunder were in serious conflict.  Their
designated accountants were to meet via videoconference on May 8, 2017.
(Ruvoldt Decl., Ex. 4).  One week before the meeting, counsel for Defendants
stated that his review of the relevant records indicated that "all the funds that
were allegedly owed by CGTI to Dandong have been accounted for and paid in
full, either through direct payments or settlements," and he asked for a copy of
the PowerPoint presentation Plaintiff had prepared for the meeting to gain
further insight into why Plaintiff believed any money was owed.  (Chalos Decl.,
Ex. 13).  Counsel for Plaintiff countered "that perforce of the business
relationship as defined in the agreement a substantial amount of money is
owed," but refused to provide a copy of Plaintiff's presentation, stating that an
advance copy was not required under the Agreement.  (*Id.* at Ex. 15).

---

[4]    The parties expressly waived their right to "challenge the validity of this Agreement,
including but not limited to by asserting fraud in the inducement, based on information
that was not disclosed, including but not limited to information that is discovered as a
result of the procedures set forth in paragraphs 7 and 8."  (Agreement ¶ 19).  As
discussed further below, neither party has challenged the validity or enforceability of
the Agreement, and Defendants have not opposed Plaintiff's motion on the basis of
fraud.

Things went downhill from there.  The May 8 accountants' meeting was memorialized in a May 12, 2017 letter from Plaintiff's counsel to Defendants' counsel.  (Ruvoldt Decl., Ex. 4).  At the meeting — where Plaintiff and counsel appeared from Beijing, and Defendants and counsel appeared from New York — Mung Xie Jen, Dandong's Chief Financial Officer, made a presentation in Mandarin that was translated into English for Defendants.  (*Id.*).  Mung presented Plaintiff's view that $102,967,162.18 was due and owing "to Dandong from … Defendants as related to the Parties' business relationship concerning the Soybean Contracts and taking into account all payments made by the Parties as set forth in Paragraph 7 of the Agreement."  (*Id.* (footnote call number omitted)).[5]  In the May 12 letter, Plaintiff's counsel suggested that the parties arrange a second meeting, and, recognizing the divergent views, that they "come … prepared to discuss the selection of an independent, third-party accountant[.]"  (*Id.*).

Defendants did more than dispute Plaintiff's view as to the money owed under the Soybean Contracts.  In a May 26, 2017 letter, Defendants' counsel

---

[5]        Plaintiff sought the following nine categories of payment:

| | | |
|---|---|---|
| 1 | Thirteen Executed Contracts and Five Resold Contracts | $6,611,272.29 |
| 2 | Contract No. 30007/A | $1,411,163.18 |
| 3 | Contract No. 30096/A | $920,437.18 |
| 4 | Contract No. 30097/A | $389,014.53 |
| 5 | Contract No. 21200, 30241/A, and 30281/A | $3,726,662.50 |
| 6 | CGTI's Overcharges | $466,755.88 |
| 7 | Pricing Overcharges | $41,936,209.95 |
| 8 | Loss of Supply Chain | $16,144,648.32 |
| 9 | Interest Accrued | $31,360,998.35 |

accused Plaintiff of acting in bad faith, and advanced Defendants' belief that
Paragraph 7 was meant to "provide for a review and reconciliation of minor
accounting discrepancies in respect to the Soybean Contracts," which
Defendants understood was required to ensure that past payments "comported
with … figures that had been previously provided to [Plaintiff] by either Gary
Hu and/or … Defendants." (Ruvoldt Decl., Ex. 6).  The accounting process was
not, in Defendants' view, a means to permit Plaintiff to "repackage[] … legal
claims[.]" (*Id.*).  To underscore that point, Defendants' letter addressed each of
Plaintiff's nine categories of damages and detailed how each one aligned with
allegations brought in the 2015 Complaint, which were settled and released, or
new claims from which Defendants had also been released in the Agreement.
(*Id.*).

Plaintiff responded on June 6, 2017, stating that Defendants were
required under the Agreement to respond through their accountants, not their
attorneys, and threatened to sue to enforce compliance with the accounting
process.  (Ruvoldt Decl., Ex. 7).  On June 12, 2017, Plaintiff provided
Defendants with a copy of a proposed complaint and order to show cause (*id.* at
Ex. 8), and on June 15, 2017, Defendants responded stating that they would
not participate in future accountant meetings given their belief that Plaintiff
had negotiated the Agreement in bad faith (*id.* at Ex. 9).

**B.    Procedural Background**

Plaintiff filed this action on June 16, 2017, and filed the instant motion
for an Order to Show Cause with the Complaint.  (Dkt. #1).  The Complaint and

Order to Show Cause seek: (i) "an order of specific performance directing Defendants to comply immediately with all terms of the Settlement Agreement," including the accounting process; (ii) an order of specific performance or injunction to prevent Defendants from seeking review of the designated accountants' or third-party accountant's findings; (iii) an order of specific performance or injunction demanding that Defendants comply with the Agreements' provision that payment be made within 90 days of the final accountant findings; (iv) an order "extending this Court's exclusive jurisdiction over Defendants' compliance with the … Agreement until … Defendants have performed fully;" (v) money damages; and (vi) an order disgorging any unjust enrichment gained by Defendants.  (*Id.*).

The Court held a conference with the parties on July 6, 2017, to discuss their diametrically-opposed views about the settlement reached in *Dandong I*, and thereafter set a briefing schedule on Plaintiff's motion.  (Dkt. #20 (Transcript)).  Defendants filed their memorandum of law and declaration in opposition to Plaintiff's motion on August 7, 2017.  (Dkt. #24-25).  Plaintiff filed a reply brief and declaration on August 28, 2017.  (Dkt. #28-29).

**DISCUSSION**

**A.    Contract Formation Under New York Law**[6]

"A settlement agreement is a contract that is interpreted according to general principles of contract law."  *Powell* v. *Omnicom*, 497 F.3d 124, 128 (2d

---

[6]    The Agreement states that it is to be governed by New York law, and the parties do not dispute the application of New York law.  (Agreement ¶ 17).

Cir. 2007).  Settlement agreements are generally favored and are "not lightly cast aside."  *Hallock* v. *State*, 64 N.Y.2d 224, 230 (1984).  To establish the existence of a binding agreement under New York law, a party must show "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound" and, moreover, the "meeting of the minds must include agreement on all essential terms."  *Kolchins* v. *Evolution Mkts., Inc.*, 8 N.Y.S. 3d 1, 9 (1st Dep't 2015) (citing 22 N.Y. JUR. 2D CONTRACTS §§ 9, 31); *see also Stonehill Capital Mgmt., LLC* v. *Bank of the West*, 28 N.Y.3d 439, 448 (2016) ("To form a binding contract there must be a 'meeting of the minds' such that there is 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms[.]'" (citations omitted)).  Where a court finds "substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the [c]ourt can neither find, nor enforce, a contract."  *Scarpinato* v. *1770 Inn, LLC*, No. 13 Civ. 955 (JS), 2015 WL 4751656, at *3 (E.D.N.Y. Aug. 11, 2015) (quoting *Barbarian Rugby Wear, Inc.* v. *PRL USA Holdings, Inc.*, No. 06 Civ. 2652 (JGK), 2008 WL 5169495, at *3 (S.D.N.Y. Dec. 9, 2008)).  Whether there has been a meeting of the minds between the parties is a question of fact.  *Barbarian Rugby*, 2008 WL 5169495, at *2.

Mutual assent may be shown "by written or spoken words or by other acts or by failure to act."  RESTATEMENT (SECOND) OF CONTRACTS § 19.  A court looks to the "objective manifestations of the intent of the parties as gathered by their expressed words and deeds," and as shown not through one single act but

14

through the "totality" of the parties' expressions "given the attendant circumstances, the situation of the parties, and the objective they were striving to attain." *Stonehill Capital Mgmt.*, 28 N.Y.3d at 448-49 (quoting *Brown Bros. Elec. Contractors, Inc.* v. *Beam Constr. Corp.*, 41 N.Y.2d 397, 399-400 (1977)). The validity of a contract depends "not [on] the parties' after-the-fact professed subjective intent, but rather [on] their objective intent as manifested by their expressed words and conduct at the time of the agreement." *Winkler* v. *Kingston Hous. Auth.*, 686 N.Y.S.2d 513, 517 (3d Dep't 1999) (citing *Brown Bros.*, 41 N.Y.2d at 399-400). The language of the agreement is the best barometer of the parties' intent and whether the minds have met as to the import of a material term. *See McNamara* v. *Tourneau, Inc.*, 464 F. Supp. 2d 232, 238 (S.D.N.Y. 2006) (citing *Brands* v. *Urban*, 587 N.Y.S.2d 698, 700 (2d Dep't 1992); *see also Luitpold Pharm., Inc.* v. *Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) ("[A] contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." (citation omitted)).

Where a reviewing court is not "able to determine what in fact the parties have agreed to," it "cannot enforce [the] contract." *Total Telcom Grp. Corp.* v. *Kendal on Hudson*, 68 N.Y.S.3d 491, 492 (2d Dep't 2018). The central inquiry for the court is whether the agreement is "sufficiently certain and specific so that what was promised can be ascertained." *Joseph Martin, Jr., Delicatessen, Inc.* v. *Schumacher*, 52 N.Y.2d 105, 109 (1981). The Court of Appeals has explained that

15

> Otherwise, a court, in intervening, would be imposing
> its own conception of what the parties should or might
> have undertaken, rather than confining itself to the
> implementation of a bargain to which they have
> mutually committed themselves. Thus, definiteness as
> to material matters is of the very essence in contract
> law. Impenetrable vagueness and uncertainty will not
> do.

*Id.* "The concern is with substance, not form." *Id.*

To be sufficiently definite, an agreement need not be drafted with surgical precision, and "courts should not be 'pedantic or meticulous' in interpreting its provisions." *In re Express Indus. & Terminal Corp.* v. *N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589-90 (1999); *Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) ("A contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement."). In short, "that what can be made certain is certain," *Delicatessen, Inc.*, 52 N.Y.2d at 110, and will stand, but where the terms of an agreement cannot be made certain, the agreement will fail as insufficiently definite to support a finding that "the parties are truly in agreement with respect to all material terms," *Kramer* v. *Greene*, 36 N.Y.S.3d 448, 439 (1st Dep't 2016). Thus the Court reviews the Agreement's plain language to determine the objective intent of the parties.

## B. Analysis

### 1. The Court Will Not Adopt the Parties' Arguments in Favor of Enforcement

Both parties ask the Court to enforce the Agreement, but the constructions they offer are at once irreconcilable and untenable. Plaintiff, for

its part, states that public policy augurs in favor of enforcing the Agreement,
citing the judicial preference for allowing parties to settle disputes on their own
terms. (Pl. Br. 6-8). This is unpersuasive, as public policy does not demand
that courts accept settlement agreements without examining their viability.
*See, e.g.*, *Prince of Peace Enters., Inc.* v. *Top Quality Food Mkt., LLC*, 760 F.
Supp. 2d 384, 397-98 (S.D.N.Y. 2011) (declining to enforce settlement
agreements where the parties each had reasonable and contradictory
interpretations of the agreement's language).

Alternatively, Plaintiff argues that the Court should enforce Paragraph 7
of the Agreement as a valid arbitration clause, whereby the parties "agreed to
substitute the process set forth in Paragraph 7 of the … Agreement for a
judicial determination of the monies owed." (Pl. Br. 11). Assuming, only for
purposes of this motion, that Paragraph 7 is a valid agreement to arbitrate, the
Court must still consider the scope of that agreement and whether Plaintiff's
legal claims, as alleged in the 2015 Complaint, are properly put before the
parties' designated accountants. *See McDonnell Douglas Fin. Corp.* v. *Pa. Power
& Light Co.*, 858 F.2d 825, 832-33 (2d Cir. 1988) (declining to extend
arbitration clause to matters beyond its scope). Read in conjunction with the
release provisions and the express disclaimer of liability, the proper scope of
Paragraph 7 is not clear from the face of the Agreement, and the Court will not
supply terms to clarify it. (*Compare* Agreement ¶ 7, *with id.* at ¶¶ 4-5, 13).

Defendants also claim that the Agreement, including Paragraph 7, is
clear and unambiguous, but construe the paragraph as limited to a review of

17

accounting records to "make any minor adjustments that might be required." (Def. Opp. 14-20). This "minor adjustments" language, however, is nowhere in Paragraph 7, and this Court may not read it in. *Brands*, 587 N.Y.S.2d at 700 ("The court may not write into the contract conditions the parties did not insert, by adding or excising terms under the guise of construction."). To be clear, the Court agrees with Defendants that other clauses in the Agreement call into serious question the breadth of Paragraph 7, but even these clauses do not explain why Paragraph 7 was drafted with such sweeping language. In the face of such contradictory provisions in the Agreement, the Court cannot agree with Defendants that Paragraph 7 is solely ministerial in nature.

Finally, Defendants argue that allowing Plaintiff to resurrect its legal claims for damages before accountants would lead to an absurd result and would frustrate the expectations of the parties. (Def. Opp. 22-24). As to the latter point, the very existence of this litigation suggests that the parties had very different expectations as to the effect of the Agreement. And as to the former, the bar for finding an "absurd result" in a contract is a very high one that is not met here in light of the broad language of Paragraph 7. *See Matter of Wallace* v. *600 Partners Co.*, 86 N.Y.2d 543, 548 (1995).

## 2. A Lack of Mutual Assent Forecloses Enforcement of the Agreement

The parties' arguments presume the existence of a valid contract and quibble over its interpretation. The Court's analysis starts one step back, as it must, and looks to whether there is a valid agreement at all. As foreshadowed by the Court's rejection of the parties' arguments, the Court is not able, upon a

review of the text of the Agreement, to say with certainty what it is the parties

have agreed to, and this demonstrates a lack of mutual assent as to the

Agreement's material terms.

Putting aside the parties' current proffers as to the proper construction of

the accounting process as set forth in Paragraph 7 — which proffers are

certainly at odds — the plain text of the Agreement suggests that the parties

failed to achieve a meeting of the minds as to the material terms.  The

Agreement speaks in sweeping terms as to *both* the termination and the

continuation of the parties' dispute.  It purports to "fully, finally, and forever

resolve[] all disputes between" the parties.  (Agreement ¶ 1).  Defendants

released Plaintiff from all claims, and Plaintiff did the same as to Defendants.

(*Id.* at ¶¶ 4-5).  Specifically, Plaintiff released Defendants from:

> all known and unknown charges, complaints,  claims,
> grievances, *liabilities*, obligations, *contracts*, promises,
> *agreements*, controversies, *damages*, actions, causes of
> action, suits, rights, *demands*, *costs*, *losses*, *debts*,
> penalties, commissions, fees, and wages, related to
> those arising out of or in connection with the Soybean
> Contracts, the alleged conduct of Gary Hu, the Parties'
> business relationship, or any of the allegations
> contained  in  the  [2015]  Complaint,  Amended
> Complaint, and/or Second Amended Complaint, which
> [Plaintiff] has, or may have against [Defendants],
> whether or not apparent or yet to be discovered.

(*Id.* at ¶ 4 (emphases added)).

The parties agreed that Plaintiff could continue to prosecute its claims

against Hu, Wang, and Mangan, and provided that, in so doing, "[Plaintiff] …

shall in no way allege in any pleadings … in the ongoing action … *or in any*

*other legal action or arbitration proceeding* … that [Defendants] … were knowing

participants in a RICO Enterprise, or in any wrongdoing." (Agreement ¶ 6 (emphasis added)). And Defendants expressly disclaimed any "wrongful, tortious or unlawful activity in connection with the business between them and the Soybean Contracts or otherwise." (*Id.* at ¶ 13).

And yet the parties drafted Paragraph 7 to provide for a meeting between accountants at which the accountants would "review and determine if *any* monies are owed to or from any of the … [p]arties … related to their business relationship concerning the Soybean Contracts, taking into account any and all payments made to date between the parties." (Agreement ¶ 7 (emphasis added)). This provision does not state, or imply, that it is a ministerial reconciliation of accounting disputes; it says that the accountants will determine what "monies are owed," without explaining how that determination will be made or how, if at all, it should be limited.

Reading the Agreement as a whole, the Court cannot divine the objective intent of the parties: Portions of the Agreement purport to extinguish the parties' business disputes, while still others suggest perpetuation of these dispute before accountants designated by the parties. In short, because the Agreement suggests two very different and equally possible outcomes, the Court cannot conclude under New York law that the Agreement's terms are sufficiently definite to support a finding that there was a meeting of the minds as to what the Agreement would achieve.

While a mutual assent analysis looks at the parties' objective intent as expressed through the parties' words and deeds, *see, e.g.*, RESTATEMENT

(SECOND) CONTRACTS § 17, the Court's research has disclosed instances in which other courts have found incompatible terms in a settlement agreement to permit the review of extrinsic evidence as to mutual assent.[7]  *See, e.g.*, *Schurr* v. *Austin Galleries of Ill., Inc.*, 719 F.2d 571, 576 (2d Cir. 1983) (looking to extrinsic evidence to inform mutual assent analysis); *Prince of Peace Enters., Inc.*, 760 F. Supp. at 397-98 (same); *Gessin Elec. Contractors, Inc.* v. *95 Wall Assocs., LLC*, 903 N.Y.S.2d 26, 28 (1st Dep't 2010) (same).  For example, in *Gessin*, the parties agreed to settle a claim for $500,000; the First Department later found that this agreement failed for a lack of mutual assent, where "95 Wall thought it was settling the full $1.7 million claim for $500,000, and plaintiff thought it was settling a $580,000 balance for $500,000."  903 N.Y.S.2d at 27.  The *Gessin* court reasoned that the internal inconsistencies rendered the contract ambiguous, such that the court could consider the parties' competing understandings of it; ultimately, after finding that the parties had completely divergent understandings of what the settlement agreement accomplished, the court held that the agreement was invalid.  *Id.* at 29; *see also id* at 28 (holding that a contract "is unenforceable if there is no meeting of the minds, i.e., if the parties understand the contract's material terms differently").[8]

---

[7]     These cases are correct that internal inconsistencies in a contract can support a finding that a contract is ambiguous and extrinsic evidence is permissible.  *Luitpold Pharm., Inc.* v. *Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015).

[8]     The First Department also rescinded the settlement agreement at issue in *Gessin* on the basis of unilateral mistake, having found that the defendant knew or had reason to know of the plaintiff's mistake.  *Gessin Elec. Contractors, Inc.*, v. *95 Wall Assocs., LLC*, 903 N.Y.S.2d 26, 30 (1st Dep't 2010).  Because there is insufficient evidence in the record before the Court to find that Defendants signed the Agreement based on a

Here, the internal inconsistences in the Agreement betoken similar misunderstanding, and a review of extrinsic evidence only confirms the absence of mutual assent.  Plaintiff's conduct at the accountants' meeting makes plain that Plaintiff believed the entire dispute — including all the claims alleged in the 2015 Complaint — to be a live controversy between the parties that had been submitted, in its entirety, for determination by accountants. (*See, e.g.*, Ruvoldt Decl., Ex. 4).  Defendants believed the very opposite: that the accounting process was intended simply to ensure there were no discrepancies in amounts previously paid between the parties to resolve prior claims.  (*Id.*, Ex. 6).  It is presumably for this reason that Defendants' counsel appeared to be genuinely confused by the indication that there was any money owed and thought that Plaintiff's RICO and fraud claims had been abandoned.  (Chalos Decl., Ex. 13 ("[W]e just went through the figures again, and we found that all the funds that were allegedly owed by CGTI to Dandong have been accounted for and paid in full[.] … I am not certain why your folks believe there are any outstanding amounts still due.")).  Where the parties approach a settlement agreement with diametrically-opposed views of what that contract will achieve, a court cannot find a valid, enforceable agreement.

The Court has considered whether the identified inconsistencies in the Agreement are ambiguities that can be resolved with additional discovery, but concludes that such a resolution cannot be reached.  Both parties' conceptions

---

mistake known to Plaintiff, the Court will not void the Agreement on that basis.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 153, comment a.

of the effect of the Agreement are reasonable:  Defendants' view that the case had settled and they had been discharged from liability is supported by the release and disclaimer clauses in the Agreement, whereas Plaintiff's view that the matter of determining what was owed under the Soybean Contracts would continue before accountants is supported by the Paragraph 7.  New York courts instruct that the proper resolution where (i) a contract is ambiguous and (ii) "[t]here is a reasonable basis for the parties' difference of opinion as to what the contract included or did not include" is to find that the agreement is "unenforceable for lack of a meeting of the minds regarding a material element thereof."  *Comput. Assocs. Intern., Inc.* v. *U.S. Balloon Mfg. Co., Inc.*, 782 N.Y.S.2d 117, 119 (2d Dep't 2004).  The Court must make that finding here.

## CONCLUSION

For the foregoing reasons, Plaintiff's application for an Order to Show Cause is DENIED.  The parties are directed to file a joint letter — or separate letters if agreement cannot be reached — by April 16, 2018, that states how the parties wish to proceed in this and/or the 2015 litigation.

SO ORDERED.

Dated:    March 19, 2018
          New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge

23