## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

### MOTION INFORMATION STATEMENT

Docket Number(s): 18-1128-cv _____     Caption [use short title] _____

Motion for: Dismissal of Appeal for Lack of Appellate Jurisdiction.

_____

_____

Set forth below precise, complete statement of relief sought:

Appellees request that the Court dismiss this appeal for lack

of appellate jurisdiction.

Dandong v. Pasternak, Baum & Co., Inc.

_____

_____

_____

_____

MOVING PARTY: Pasternak, Baum & Co., Inc.; Columbia Grain Trading, Inc.; William C. Gallo     OPPOSING PARTY: Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd.

| ☐ Plaintiff | ☐ Defendant |
| ☐ Appellant/Petitioner | ☑ Appellee/Respondent |

MOVING ATTORNEY: David R. Fine     OPPOSING ATTORNEY: Harold J. Ruvoldt

[name of attorney, with firm, address, phone number and e-mail]

| K&L Gates LLP | Fleming Ruvoldt, PLLC |
| 17 N. 2d St., Harrisburg, PA 17101 | 1700 Broadway, 28th Fl., New York, NY 10019 |
| (717) 231-4500  david.fine@klgates.com | (212) 706-1850 hruvoldt@flemingruvoldt.com |

Court- Judge/ Agency appealed from: S.D.N.Y., Failla, J.

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes  ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes  ☐ No  ☐ Don't Know

Is oral argument on motion requested?  ☐ Yes  ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☐ Yes ☑ No If yes, enter date: _____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?  ☐ Yes ☐ No
Has this relief been previously sought in this court?  ☐ Yes ☐ No
Requested return date and explanation of emergency: _____

_____

_____

_____

Signature of Moving Attorney:

Date: 8-24-18  Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

IN THE

# United States Court of Appeals for the Second Circuit

| | | |
|---|---|---|
| DANDONG OLD NORTHEAST AGRICULTURE AND ANIMAL HUSBANDRY CO., LTD., fka Dandong Pasite, | : | No. 18-1128-cv |
| Plaintiff-Appellant, | : | |
| | : | |
| *vs.* | : | |
| | : | |
| PASTERNAK, BAUM & CO., INC.; COLUMBIA GRAIN TRADING, INC.; WILLIAM C. GALLO, | : | |
| Defendants-Appellees. | : | |

## MOTION TO DISMISS APPEAL FOR
## LACK OF APPELLATE JURISDICTION

David R. Fine
**K&L GATES LLP**
17 North Second St., 18th Fl.
Harrisburg, PA 17101
(717) 231-4500

Michael G. Chalos
Gerald A. Novack
Michael J. Lignos
**K&L GATES LLP**
599 Lexington Ave.
New York, NY 10022
(212) 536-3900

*Counsel for Appellees*

Pasternak, Baum & Co., Inc.; Columbia Grain Trading, Inc.; and William C. Gallo (collectively, "Appellees"), move for an order dismissing this appeal for lack of appellate jurisdiction. In support of their motion, Appellees assert the following:

## BACKGROUND

Appellant Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd. ("Dandong"), has taken an appeal from a non-final order of the district court that the district court declined to certify for appeal under 28 U.S.C. §1292 and that does not fit within any other exception to the rule against immediate appeals of non-final orders.

The factual background of this appeal is somewhat complex, but the Court need not be familiar with most of it to resolve this motion.[1]

Dandong is a soybean purchaser and crusher in China, and it purchases soybeans grown in the United States and other parts of the world[2] Between 2008 and 2010, the parties to this litigation entered into a series of contracts for the purchase, sale and shipment of soybeans to China.[3] At the time those contracts were executed, Gary Hu

---

[1] While the Appellees will only briefly discuss the background facts in this motion, they note that Dandong's factual statement in its merits brief to this Court is replete with inaccuracies. If this appeal proceeds to the merits, the Appellees will correct those misstatements.

[2] *See Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd. v. Pasternak, Baum & Co., Inc.,* No. 17-4571, at 3 (S.D.N.Y. March 19, 2018) ("March 19 Opinion") (A-128). In this motion, references to "(A-___)" are to the appendix Dandong filed with its merits brief to this Court.

[3] *See* Declaration of Michael G. Chalos in Support of Defendants' Response to Plaintiff's Motion for an Order to Show Cause ("Chalos

was the executive director and general manager of Dandong's crushing plant in Dandong, China.[4] At the same time, Mr. Hu was the representative of a Chinese affiliate of Appellee Columbia Grain Trading, Inc. ("CGTI").[5] Without Appellees' knowledge, consent or involvement, Mr. Hu abused his dual position by manipulating various terms of the soybean contracts to divert to himself funds that properly belonged to Dandong.[6]

Dandong discovered Mr. Hu's wrongdoing in 2010, and it sued CGTI and others in China the following year.[7] Dandong filed three lawsuits, and the third resulted in a December 16, 2013, decision by the Higher People's Court of Liaoning Province (the "Chinese Court").[8] The Chinese Court directed CGTI to pay Dandong a judgment of US $3,735,684.10.[9] The Appellees had already "returned" US $7,142,196.82 to Dandong in the course of the first two lawsuits in China, and so the total of their payments to Dandong was US $10.877 million.[10]

---

Decl.") at ¶ 4. Although the Chalos declaration was a material part of the record before the district court, Dandong did not include it in its appendix. The Appellees attach it to this motion at Tab "A." The Appellees are not including the exhibits to the Chalos declaration.

[4]    *See* Chalos Decl. at ¶ 5.

[5]    *See* Chalos Decl. at ¶ 6.

[6]    *See* Chalos Decl. at ¶ 7

[7]    *See* Chalos Decl. at ¶ 17.

[8]    *Id.*

[9]    *See* Chalos Decl. at ¶ 18(e).

[10]    *See* Chalos Decl. at ¶ 19.

On December 23, 2015, Dandong filed a complaint in the U.S. District Court for the Southern District of New York naming as defendants Mr. Hu, two relatives of Mr. Hu and—*res judicata* notwithstanding—the Appellees here (the "2015 Litigation").[11] The 2015 complaint asserted RICO claims and various common-law claims.

The Appellees (again, Pasternak, Baum & Co., Inc. ("Pasternak"); CGTI and William C. Gallo) responded to the 2015 complaint in two ways. First, they served a Rule-11 notice on Dandong's counsel.[12] Second, in accordance with the presiding judge's practice, they sought permission to file a motion to dismiss under Rule 12(b)(6) asserting *res judicata,* the statute of limitations and failure to plead fraud with particularity.[13] The district judge, the Honorable Katherine Polk Failla, held a pre-motion conference with counsel and "expressed skepticism at certain of [Dandong's] claims," particularly in light of recent Supreme Court authority regarding the need for RICO plaintiffs to assert domestic injury.[14] At the conclusion of the conference, Judge Failla allowed Dandong to file an amended complaint.[15]

---

[11]  *See Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd. v. Hu,* No 15-10015 (S.D.N.Y.). (A-76)

[12]  March 19 Opinion at 5. (A-130)

[13]  *Id.*

[14]  *Id.* at 6. (A-131)

[15]  *Id.*

Between the date of that conference and the date on which Dandong's amended complaint was ultimately due to be filed, Dandong's counsel approached the Appellees' counsel to broach the possibility of settlement.[16] Ultimately, Dandong filed its amended complaint on November 18, 2016, but, on that same day, Dandong's counsel submitted a letter to Judge Failla alerting her that Dandong and the Appellees had reached a settlement in principle.[17] Ultimately, on February 15, 2017, Dandong and the Appellees submitted to Judge Failla a stipulation dismissing the Appellees from the 2015 Litigation, and Judge Failla "so ordered" the stipulation.[18]

Within weeks of the entry of that stipulation, Dandong, on the one hand, and Pasternak, CGTI and Mr. Gallo, on the other hand, had a disagreement about the meaning of one paragraph of the settlement agreement they had entered into with respect to the 2015 litigation.[19]

---

[16]    *Id.*

[17]    *Id.*

[18]    *Id.* at 7. (A-132) It is perhaps helpful to note the disposition of the 2015 litigation with respect to the other defendants. Dandong did not effect service of process on Gary Hu. Esther Hu Mangan and Yuhua Wang filed a motion to dismiss. After briefing, Judge Failla granted the motion to dismiss the RICO claims and then declined to exercise supplemental jurisdiction over the supplemental state-law claims. Had the Appellees not settled out of the 2015 litigation, they would have sought dismissal as well and, given the result with respect to the other defendants, the Appellees would have prevailed.

[19]    *Id.* at 10-11. (A-135-A-136) While the merits of this appeal center around the meaning of that disputed paragraph of the settlement agreement, there is no need for the Court to delve into those merits for purposes of resolving this motion.

4

On June 16, 2017, Dandong filed this lawsuit in the Southern District of New York, naming Pasternak, CGTI and Mr. Gallo as defendants (the "2017 Litigation"). Dandong's complaint, docketed at No. 17-4571, alleged that the defendants were in breach of the settlement agreement *and* that the defendants had been unjustly enriched.[20] The district court's clerk assigned the new case to Judge Failla because of its relationship to the 2015 case.

At the same time it filed its 2017 complaint, Dandong filed what it called a "Motion for Order to Show Cause to Enforce Settlement Agreement."[21] Judge Failla conducted a conference with counsel on July 6, 2017.[22] Notably, there was no discussion during that conference of any request for an injunction. During that conference, Judge Failla heard from counsel, and she first broached the possibility that there had been no meeting of the minds with respect to the settlement agreement.[23] Nonetheless, the session ended with an agreement that the defendants would respond to the motion for a show-cause order.[24]

---

[20]     March 19 Opinion at 12-13. (A-137-A-138); Complaint. (A-8)

[21]     *See* Docket at 1. (A-2) Dandong's motion is not in its appellate appendix and, so, the Appellees attach both Dandong's motion and supporting brief to this motion at Tab "B."

[22]     *See* July 6, 2017, Transcript. (A-37)

[23]     *Id.* at 14. (A-50)

[24]     *Id.* at 35-36. (A-71-A-72)

After additional briefing, Judge Failla entered an opinion and order on March 19, 2018.[25] She held that the intent of the parties with respect to the disputed clause in the settlement agreement was ambiguous, that both sides had reasonable bases for their respective interpretations and that, therefore, the settlement agreement was unenforceable for lack of a meeting of the minds.[26] She accordingly denied Dandong's motion for an order to show cause and directed the parties to either agree on how the litigation before her should proceed or send her letters with their individual positions.[27]

Dandong filed its notice of appeal on April 16, 2018.[28]

Judge Failla conducted a telephonic conference with counsel on May 2, 2018, to discuss what further proceedings should be had.[29] Dandong's counsel conceded that Judge Failla's March 19 order did not end the 2017 litigation because there remained pending an additional claim (the one for unjust enrichment).[30] At that conference and by letter briefs, Judge Failla heard from counsel about whether she should certify her March 19 order for interlocutory appeal under 28 U.S.C. § 1292(b).

---

[25]  *See* March 19 Opinion. (A-126)

[26]  *Id.* at 23. (A-148)

[27]  *Id.*

[28]  A-149.

[29]  A-159.

[30]  A-162.

6

By order dated June 29, 2018, Judge Failla declined to certify her March 19 order because the requirements for such an interlocutory appeal were not met.[31] Although neither party suggested it, Judge Failla also considered whether she should enter a final order as to fewer than all claims under Federal Rule of Civil Procedure 54(b) and concluded that she should not.[32] Finally, she stayed the 2017 litigation pending action by this Court.[33]

Dandong filed its opening merits brief in this Court on August 13, 2018. The Appellees' merits brief is due November 13, 2018.

## ISSUE PRESENTED

Whether the Court should dismiss this appeal for lack of appellate jurisdiction when there remains a claim pending in the district court, the district court declined to certify its challenged order for immediate appeal under 28 U.S.C. § 1292 or Federal Rule of Civil Procedure 54(c) and no other exception to the rule against interlocutory appeals applies.

## ARGUMENT

### I.    There is no final order or judgment.

"The courts of appeals … have jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291.

---

[31]    *See Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd. v. Pasternak, Baum & Co., Inc.,* No. 17-4571, at 4-5 (S.D.N.Y. June 29, 2018) (the "June 29 Order"). (A-185-A-186)

[32]    *Id.* at 5. (A-186)

[33]    *Id.* at 7. (A-188)

The Supreme Court has held that the finality requirement "evinces a legislative judgment that restricting appellate review to final decisions prevents the debilitating effect on judicial administration caused by piecemeal appeal disposition of what is, in practical consequence, but a single controversy." *Coopers & Lybrand v. Livesay, 4*37 U.S. 463, 471 (1978) (internal quotation marks and alteration omitted).

For an order to be final within the contemplation of Section 1291, it must "end[] the litigation on the merits and leave[] nothing for the court to do but execute the judgment." *Wabtec Corp. v. Faiveley Transp. Malmo AB,* 525 F.3d 135, 137 (2d Cir. 2008) (internal quotation marks omitted). "With only a limited number of exceptions, orders that 'allow[] the litigation to continue' are not final for purposes of § 1291 and therefore are not immediately appealable." *Ashmore v. CGI Grp., Inc.,* 860 F.3d 80, 84 (2nd Cir. 2017) (*quoting Wabtec,* 525 F.3d at 138 (internal quotation marks omitted)).

In its opening merits brief, Dandong asserts without elaboration that its appeal was from a final order.[34] Dandong is wrong.

As the district court noted in its June 29, 2018, order, Dandong included in its 2017 complaint "claims for breach of contract and unjust enrichment …"[35]

---

[34]    *See* Dandong Opening Br. at 1.

[35]    June 29 Order at 2. (A-183)

Dandong took its appeal from the district court's March 19, 2018, order, which denied Dandong's motion for an order to show cause and held that the parties' settlement agreement was not enforceable. As the district court explained in its June 29 Opinion, the March 19, 2018, order did not dismiss any claim.[36] Even if the March order could be interpreted functionally to dismiss the breach-of-contract claim, it took no action with respect to the unjust-enrichment claim, and that claim indisputably remains pending.

Because there remains pending in the district court at least one claim—and perhaps two claims—there is no final order or judgment in this case.

## II. No exception to the final-order rule applies.

There are limited exceptions to the finality requirement. Thus, a district judge may certify an interlocutory order for immediate appeal. *See* 28 U.S.C. § 1292(b). A district judge may enter a final judgment on fewer than all of the claims in order to allow an immediate appeal under Federal Rule of Civil Procedure 54(b). An interlocutory order may qualify for immediate appeal under the collateral order doctrine. *See Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546 (1949). Appellees will not address these exceptions further since the district judge in this case declined to certify under Section 1292 or to enter a partial final judgment under Rule 54, and Dandong has not argued that

---

[36]    *Id.*

9

the challenged order satisfies the requirements of the collateral order doctrine (nor could it).

In its opening brief, Dandong points to the exception in 28 U.S.C. § 1292(a)(1) allowing appeals from "[i]nterlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." *See* Dandong Opening Br. at 1, 4.[37] Dandong's reliance on Section 1292(a)(1) is mistaken.

First, Dandong did not move for an injunction. It filed a motion requesting an order to show cause seeking specific enforcement of the settlement agreement as Dandong interpreted it, and the district court denied the motion. Neither Dandong's motion nor its supporting brief uses the word "injunction" or refers to Federal Rule of Civil Procedure 65, which governs injunction requests, or to cases setting forth the standard for injunctive relief. During the July 6, 2017, conference with Judge Failla following Dandong's filings, Dandong's counsel made no mention of a request for an injunction.

---

[37]     In its summary of the argument, Dandong suggests as a separate basis for appellate jurisdiction "judicial economy." *See* Dandong Opening Br. at 4. Dandong offers neither explanation nor authority for its reference to "judicial economy" as a basis for the Court to ignore the finality rule, and there is no such exception. (Even if "judicial economy" were a consideration, it would not weigh in Dandong's favor. An immediate appeal would not end the litigation in the district court because Dandong still has pending its unjust-enrichment claim, and that remaining claim could later spawn its own appeal to this Court such that there would be two appeals rather than one.)

Notably, Dandong seems to have chosen its procedural path purposefully. Paragraph 12 of the settlement agreement provides that a party that proves a breach will be entitled to "any applicable and appropriate equitable remedies, including injunctive relief *or* specific performance …"[38]   In its motion for a show-cause order, Dandong requested specific performance and said nothing at all about seeking an injunction. Only now, when it seeks to take an immediate appeal, does Dandong seek to characterize its request as one for an injunction.

Although this Court and the Supreme Court have held that Section 1292(a)(1) provides a "narrow" exception to the finality requirement, both have held that the exception *may* apply "where the district court's order has the 'practical effect of denying an injunction." *See Carson v. American Brands, Inc.,* 450 U.S. 79, 83-84 (1981); *Grant v. Local 638,* 373 F.3d 104, 107 (2nd Cir. 2004). To determine if an order meets that standard, the Court looks to see if an immediate appeal "will further the statutory purpose of 'permit[ting] litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence." *Id.* (quotations omitted). "If serious or irreparable harm is not present, the general congressional policy against piecemeal review will preclude interlocutory appeal." *Id.* (quotations omitted).

The appellant bears the burden of proving that an immediate appeal is necessary to avoid serious or irreparable harm. *See Carson,*

---

[38]    A-33 (emphasis added).

450 U.S. at 84. In its opening merits brief, Dandong makes no meaningful effort to sustain that burden. It briefly describes some of the cases dealing with Section 1292(a)(1) and the practical-effect exception, but it makes only a fleeting effort to demonstrate that Dandong's appeal meets the narrow exception:

> This Court should hear and consider this appeal. Absent this Court's intervention, the hope of enforcing the Agreement ended with the district court's ruling. Plaintiff sought specific performance and that relief was denied. If the decision of the District Court stands, Plaintiff will forever lose its right to achieve the benefits of the settlement that the Settling Defendants improperly breached.

Dandong's Opening Br. at 39. Dandong's cursory argument misses the mark. Its burden in invoking Section 1292(a)(1) is not to prove that it would be harmed if the district court's decision were affirmed but to prove that Dandong would suffer serious or irreparable harm if it were made to wait to take an appeal. *See Carson,* 450 U.S. at 83-84; *Grant,* 373 F.3d at 107. Dandong makes no effort to meet *that* burden.[39]

\*\*\*

Simply stated, Dandong filed a complaint asserting claims for breach of contract and unjust enrichment. Dandong sought a show-cause order, and the district court denied it because it was based on the contract and the district court concluded the contract was

---

[39]     Of course, if it believed that the district judge erred in her March 19 order and that waiting for appellate review would subject it to irreparable harm, Dandong could have withdrawn the unjust-enrichment claim and rendered the March 19 order immediately appealable. Dandong chose a different course.

unenforceable. The district court has not as yet dismissed either of Dandong's claims. Even if it could be said that the practical effect of the March 19 order was to doom Dandong's breach-of-contract claim, Dandong's unjust-enrichment claim remains pending. Thus, there has been no final order in this case.

Dandong did not request and the district court did not refuse to grant an injunction. The district court's order did not have the practical effect of denying injunctive relief, and the purposes underlying Section 1292(a)(1) are not implicated because Dandong has not pointed to (and cannot point to) any evidence that it will suffer irreparable harm if it is required to wait in the ordinary course for there to be a final order in the district court. *See Grant,* 373 F.3d at 107.

# **CONCLUSION**

The Court should grant this motion and dismiss the appeal for lack of appellate jurisdiction.

Respectfully submitted,

Michael G. Chalos
Gerald A. Novack
Michael J. Lignos
**K&L GATES LLP**
599 Lexington Ave.
New York, NY 10022
(212) 536-3900

/s/ David R. Fine
David R. Fine
**K&L GATES LLP**
17 North Second St., 18th Fl.
Harrisburg, PA 17101
(717) 231-4500

August 24, 2018

*Counsel for Appellees*

14

## CERTIFICATE OF SERVICE

I certify that, on August 24, 2018, I filed the attached motion with the Court's ECF system such that all counsel will receive service automatically.

/s/ David R. Fine

# Tab "A"

**K&L GATES, LLP**
Michael G. Chalos
599 Lexington Ave.
New York, NY10022
Telephone:  212-536-4097
Fax:  212-536-3901
michael.chalos@klgates.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------X
DANDONG OLD NORTH-EAST AGRICULTURE     :     Case No. 1:17-cv-04571-KPF
& ANIMAL HUSBANDRY CO., LTD., formerly      :     Related Case 1:15-cv-10015-KPF
known as DANDONG PASITE,                              :
                                                                          :
                                    Plaintiff,              :
        - against -                                              :
                                                                          :
PASTERNAK, BAUM & CO., INC., COLUMBIA      :
GRAIN TRADING INC., and WILLIAM C.              :
GALLO,                                                             :
                                                                          :
                                    Defendants.    :
---------------------------------------------------------------------X

**DECLARATION OF MICHAEL G. CHALOS IN SUPPORT OF DEFENDANTS'**
**RESPONSE TO PLAINTIFF'S MOTION FOR AN ORDER TO SHOW CAUSE**

Michael G. Chalos, pursuant to 28 U.S.C. § 1746, declares as follows:

1.       I am an attorney admitted to practice in the State of New York and before this

Court.  I am a member of the law firm of K&L GATES LLP, attorneys for Defendants in the

above captioned case, and in Related Case No. 1:15-cv-10015-KPF (the "RICO Action").[1]

2.       I submit this declaration in support of Defendants' Response to Plaintiff's Motion

for an Order to Show Cause.  I have personal knowledge of the matters set forth herein.  As to

those matters stated on information and belief, I believe them to be true based on documents and

---
[1] Capitalized terms herein shall have the meaning ascribed to them in Defendants' Memorandum Response to
Plaintiff's Motion for an Order to Show Cause.

information obtained from employees and representatives of Defendants and/or counsel for

Plaintiff, true and correct copies of which are described below and attached hereto.

**Background of Underlying Dispute Pertaining to the Soybean Contracts**

3.     Plaintiff was a purchaser of U.S. soybeans and grains in China.  *See* Related Case

ECF No. 1, ¶5.  Defendant CGTI is a wholesale grain dealer; Defendant Pasternak is a

commodity brokerage firm; and Defendant Gallo is an executive of both firms.  *See id.*, ¶¶9–11.

4.     Between 2008 and 2010, the Parties entered into a series of contracts (the

"Soybean Contracts") for the purchase, sale, and shipment of soybeans to China.  *See id.*, ¶42.

5.     Gary Hu, at the time the Soybean Contracts were executed, was employed by

Plaintiff and served as Plaintiff's Executive Director and General Manager for its crushing plant

in Dandong, China.  *See id.*, ¶6.

6.     At that time, Hu also served as the representative of Defendant CGTI's corporate

affiliate in Dalian, China.  *See id.*, ¶8.

7.     Hu, without Defendants' knowledge or consent, abused his dual position by

manipulating the terms of the Parties' Soybean Contracts to divert to himself funds that belonged

to Plaintiff.  *See id.*, ¶44; *see also* Related Case ECF No. 73, ¶19.

**Hu's Manipulation of the Soybean Contracts**

8.     The price for each Soybean Contract the Parties executed had two components,

the Chicago Board of Trade (CBOT) price and the "premium", which added up to the "Final

Contract Price."  See Related Case ECF No. 1, ¶27.

9.     The "premium" represented Defendants' fee for shipping the soybeans, which

were sold on a Cost & Freight, Free Out (CNF FO) basis, meaning Defendants undertook the

"cost and freight" of loading and shipping the soybeans to China, while the Plaintiff was responsible for the costs of discharging the cargo at the port of destination.

10.     Upon execution of each Soybean Contract, Plaintiff posted a Letter of Credit ("LOC") intended to at least cover the Final Contract Price.  *See id.* ¶32.

11.     The LOC amount usually exceeded the Final Contract Price, and Plaintiff would accordingly be entitled to a refund from Defendants (a "Contract Surplus").  *See id.*, ¶33. Occasionally, the LOC would not cover the Final Contract Price, and Plaintiff was required to post an additional LOC (a "Contract Deficit"). *See id.*, ¶44.

12.     Because the Parties in the period of 2008 to 2010 had multiple open Soybean Contracts at any given time, and were usually in the process of negotiating additional new contracts, the Contract Surplus or Contract Deficit resulting from one Soybean Contract was often credited to or debited from another Soybean Contract.  This created a matrix of monies being exchanged and/or credited between the Parties across several soybean contracts.

13.     Without Defendants' knowledge or consent, and presumably without Plaintiff's knowledge or consent, Hu altered the Final Contract Price on Plaintiff's version of the Soybean Contracts, often by manipulating the agreed premium amount.  *See, e.g.*, Related Case ECF No. 73, ¶57.

14.     As a result of such manipulation, Plaintiff received a smaller refund (i.e., a smaller Contract Surplus) than was actually paid and/or credited by Defendants under the terms of the Soybean Contracts at issue.  *See id.*, ¶43.

15.     Defendants, at Hu's instruction, which instruction Hu represented to Defendants came from Plaintiff, would return to Hu the full amount of the actual and correct Contract Surplus based on the *bona fide* version of each Soybean Contract.

3

16.     Hu, unbeknownst to the Parties, would then keep for his own benefit the difference between the actual and correct Contract Surplus and the smaller refund that Dandong actually received, which amount(s) was based on the altered Soybean Contracts Hu presented to Plaintiff.  This was the basis for the US $10.877 million claims that were made in the Chinese Litigations and again re-asserted in the RICO Complaint.  *See, e.g.*, *id.*, ¶¶41–44.

**The 2011 Chinese Litigations**

17.     After discovering Hu's wrongdoing in late 2010, Plaintiff commenced three lawsuits in China in early 2011 against Defendant CGTI and others, alleging claims arising from Mr. Hu's conduct with respect to the Soybean Contracts.  The third such lawsuit resulted in a December 16, 2013 decision by the Higher People's Court of Liaoning Province (the "Higher Court"), which decision describes all of Plaintiff's claims against Defendants in the three Chinese Litigations.  A true and correct copy of such decision and certified translation of same are attached hereto as **Exhibit 1**.

18.     In its decision, the Higher Court describes the three Chinese Litigations as follows:

a.  On February 17, 2011, Plaintiff filed two lawsuits in China against Defendant CGTI and others alleging claims based on the Soybean Contracts at issue.  The two lawsuits were docketed with numbers (2011) Dan Min San Chu Zi No. 00010 and (2011) Dan Min San Chu Zi No. 00011, respectively.  *See* Exhibit 1, pp. 4–5.

b.  On March 5, 2011, Plaintiff submitted an application to the Intermediate People's Court of Dandong (the "Chinese Trial Court") to withdraw Case No. (2011) Dan Min San Chu Zi No. 00011 on the ground that Defendant CGTI "had returned

4

most of the [sought] funds to Dandong . . . ." *See id.*, p.5. That case was
accordingly withdrawn on March 7, 2011. *See id.*

    c.  On April 9, 2011, Plaintiff submitted an application to the Chinese Trial Court to
withdraw Case No. (2011) Dan Min San Chu Zi No. 00010 on the ground that
Defendant CGTI "had returned US$7.1 million to Dandong . . . ." *See id.* That
case was accordingly withdrawn on April 18, 2011. *See id.*

    d.  As a result of the above-described two lawsuits, Defendant CGTI "returned
US$7,142,196.82 to Dandong . . . ." *See id.*, p.6.

    e.  With respect to a third lawsuit filed by Dandong against Defendant CGTI on
April 26, 2011, the Higher Court upheld the trial court's judgment in favor of
Plaintiff for an additional US $3,735,684.10. *See id.*, pp.22–23.

19.    The amount paid by Defendants as a result of the three Chinese Litigations was
equal to the US $10.877 million claim later asserted by Plaintiff in its RICO Complaint. *See*
Related Case ECF No. 1, ¶¶45 and 78.

**Plaintiff's 2015 Demands for Evidence and Information Regarding Hu's Conduct**

20.    In June 2015, Plaintiff sought from Defendants additional information and
evidence that Plaintiff believed Defendants possessed for the stated purpose of using same in its
civil and criminal actions against Hu.

21.    To that end, on June 30, 2015, Plaintiff and Defendant CGTI executed a
Cooperation Agreement (hereinafter, the "June 2015 Agreement") with respect to the Soybean
Contracts, wherein Plaintiff acknowledged that Gary Hu "by himself" engaged in certain
wrongdoing and that "[b]oth parties discovered [his] fraudulent conducts . . . and subsequently
stopped him from further fraudulence." See Exhibit 2, ¶3. Pursuant to the terms of the June

2015 Agreement, Defendant CGTI undertook to "fully cooperate with [Plaintiff] in its investigation against Gary Hu for his unauthorized collection of the funds of [Plaintiff]" and to "provide all evidence in [its] possession to [Plaintiff] for [Plaintiff's] legal actions against Hu Gary Ming for investigating his criminal conducts[.]" *See id.*, ¶¶5.1 and 5.2. A true and correct copy of the June 2015 Agreement is attached hereto as **Exhibit 2**.

22.     In this regard, Defendants provided Plaintiff with detailed signed affidavits affirming and documenting Hu's conduct, which Defendants understand were provided to Chinese authorities and used in the criminal case against Hu. A true and correct copy of such affidavits is attached hereto as **Exhibit 3**.

23.     In September 2015, Plaintiff notified Defendants, through its counsel that it intended to continue to pursue its claims against Hu by filing a new legal action in the U.S., and demanded to interview Defendant Gallo with respect to Hu's conduct in preparation for filing such action.

24.     Mr. Gallo agreed to meet with Plaintiff's primary shareholder, Mr. Wang Wenliang, to discuss whether additional information existed in respect to Hu, subject to Plaintiff agreeing not to misuse or manipulate any such information to include Defendants in the threatened action.

25.     In this regard, Defendants invited Mr. Wang Wenliang to Defendants' offices to identify any further information or documents that would be useful to Plaintiff in its pursuit of the Hu matter.

26.     Plaintiff refused to commit to not using any additional information obtained in the proposed meeting with Mr. Gallo against Mr. Gallo and/or the other Defendants, and rejected Defendants' invitation.

**Plaintiff's RICO Complaint and Proceedings Pertaining to Same**

27.     On December 23, 2015, Plaintiff filed its RICO Complaint against the Hu

Defendants and the Defendants herein with respect to the Soybean Contracts at issue, thus,

commencing the RICO Action.  A true and correct copy of the RICO Complaint is attached

hereto as **Exhibit 4**.

28.     In light of Plaintiff's incessant and improper harassment of Defendants over the

course of nearly five years and given Plaintiff's counsel's apparent failure to investigate the facts

and circumstances of the allegations made in the RICO Complaint before filing same,

Defendants served Plaintiff and its counsel with a Rule 11 letter on June 2, 2016, noting therein

that material elements of the factual and legal allegations in the RICO Complaint were without

legal or factual basis and constituted violations of Rule 11(b) of the Federal Rules of Civil

Procedure, and if not properly addressed, a Motion for Sanctions, as well as reasonable costs and

attorneys' fees, pursuant to such Rule would be filed in due course.  A true and correct copy of

the cover email to Plaintiff's counsel, which contained the proposed Rule 11 Motion to be filed,

is attached hereto as **Exhibit 5**.

29.     On June 17, 2016, Defendants filed a letter to the Court in the RICO Action

requesting a pre-motion conference, wherein Defendants indicated their intention to move to

dismiss the RICO Complaint.  *See* Related Case ECF No. 44.  A true and correct copy of such

letter is attached hereto as **Exhibit 6**.

30.     A Pre-Motion Conference was held before the Court in the RICO Action on June

30, 2016.  A transcript of such Conference is attached hereto at **Exhibit 7**.

31.     The Court granted Plaintiff until September 9, 2016 to amend its RICO

Complaint, eventually extending the deadline until November 18, 2016.  *See* Exhibit 7, 25:6–9;

*and* Related Case ECF No. 66.

**Negotiating the Settlement Agreement Fully and Finally Resolving Plaintiff's Claims and Allegations in the RICO Complaint**

32.     A little more than a month before Plaintiff approached Defendants with a

settlement overture, in September 2016, it was widely reported that Plaintiff's executive, Mr.

Wang Wenliang, was one of forty-five members of the Chinese legislature who was expelled

following allegations of his involvement in a vote-buying scandal.  The online newspaper article

from NYTimes.com containing such report is attached hereto as **Exhibit 8**.

33.     On November 7, 2016, Plaintiff approached Defendants with a settlement

overture.

34.     Plaintiff's counsel represented to the undersigned Declarant that Plaintiff wished

to discontinue the pursuit of all of its claims against Defendants and dismiss Defendants from the

RICO Action, for no monetary compensation, if Defendants agreed to participate in two

meetings between: (1) the corporate Parties' respective accountants in respect to an accounting

review of monies paid and credits applied to the Soybean Contracts at issue, so that Plaintiff was

certain that the amounts it intended to claim against Hu and/or the Hu Defendants were accurate,

and to adjust minor accounting discrepancies, if any, as between the Parties; and (2) the Parties'

respective corporate officers in respect to collecting further information pertaining to Hu's

conduct for use in Plaintiff's continuing claims against Hu and/or the Hu Defendants.

35.     Prior to filing the RICO Complaint, and subsequently throughout settlement

negotiations, Plaintiff's counsel represented on multiple occasions that, for Plaintiff and

Plaintiff's primary shareholder, Mr. Wang Wenliang, the main objective of pursuing the RICO

8

claims based on the Soybean Contracts, at least with respect to Defendants, was not to recover the monetary damages sought (presumably because those amounts had already been recovered by way of the Chinese Litigations), but rather, to obtain from Defendants information and evidence that could be used in Plaintiff's ongoing civil and criminal actions against Hu, both, in the pending RICO Action and, more importantly, in China.

36.     Defendants explicitly demanded that any such extra-judicial fact-gathering meetings be predicated on a full and final settlement, release, and dismissal of all of Plaintiff's claims in the RICO Complaint.

37.      On November 16, 2017, the undersigned Declarant sent an email to Plaintiff's counsel confirming the broad principles of the settlement to which the Parties intended to negotiate and agree, including Plaintiff's agreement to dismiss forthwith, with prejudice, the RICO Complaint against Defendants and to waive any existing or future claims, whether known or unknown, against Defendants that related to or arose out of the Soybean Contracts in question, or in respect to Hu's alleged wrongdoing.  Plaintiff's counsel indicated they agreed to such broad principles and specifically wrote that the purpose of the proposed settlement of the RICO Action, was so that the Parties "never have to litigate again".  A true and correct copy of the above-described November 15–16, 2017 email exchange with Plaintiff's counsel is attached hereto as **Exhibit 9**.

38.     On November 18, 2016, the Parties' respective counsel executed an Agreement in Principle to memorialize the above-described settlement principles.  A true and correct copy of the Agreement in Principle is attached hereto as **Exhibit 10**.

**Plaintiff's Represented Intentions with Respect to the Accountants' Meeting**

39.     As a result of Hu's manipulation of the contract terms on the altered version of the Soybean Contracts presented to Plaintiff by Hu, Plaintiff's counsel represented to the undersigned Declarant several times during the course of the settlement negotiations that the reason for the requested accounting exercise was to compare Defendants' accounting records with Plaintiff's accounting records for the Soybean Contracts at issue.  The exercise was represented by Plaintiff's counsel to be a ministerial accounting exercise so that Plaintiff's continuing claims against Hu and/or the Hu Defendants would be accurate in the amounts stated. That is, the corporate Parties' respective accountants would review the *bona fide* Soybean Contracts entered into between the Parties, conduct an accounting of all payments and/or credits made in accordance with the terms of such Soybean Contracts, and verify that such payments and/or credits were accurately calculated and accounted for.  The review required only an inspection and examination of the Soybean Contracts and the relevant documentation surrounding same.

40.     During such discussions, Plaintiff's counsel also requested that if there were any minor accounting discrepancies found, they would be resolved between the accountants, and if the accountants could not agree, the accounting discrepancies would be submitted to a third-party accountant.

41.     The undersigned Declarant indicated to Plaintiff's counsel, on multiple occasions during the Parties' settlement negotiations and before the above-described accounting exercise took place that Defendants had reviewed the relevant accounting records, including the Soybean Contracts and payments and adjustments made between the Parties pursuant to their terms, and

10

had determined that no monies were owed from Defendants to Plaintiff. *See, e.g.*, Exhibit 15, pp.2–3.

42.     In reliance on the representations made by Plaintiff's counsel regarding the primary purpose of the accounting exercise being to verify and confirm the Parties' respective accounting records as they related to the Soybean Contracts at issue, Defendants agreed to participate in a post-Settlement Agreement meeting of accountants provided that all of the claims and allegations made in the RICO Complaint and any other claims, known and/or unknown, would be fully and finally settled and the RICO Complaint would be dismissed, with prejudice. The exchange of e-mails attached hereto as Exhibit 9, and the Agreement in Principle attached hereto as Exhibit 10 so state.

43.     At no time during the negotiations leading up to the final Settlement Agreement did the Parties ever discuss or agree to any language in the Settlement Agreement that would in any way abrogate or vitiate those terms in the Settlement Agreement by which Plaintiff's RICO Complaint and claims were settled, dismissed, and released.

44.     During settlement negotiations, in January 2017, Plaintiff's counsel proposed a change to the language of the Settlement Agreement to which Defendants objected.  The proposed change is not directly relevant to Paragraph 7—rather, it pertained to former employees of Defendants that would be carved out of the release—but the Parties' discussions regarding such change are informative of their agreed intent to enter a full and final Settlement Agreement by which all of Plaintiff's allegations pertaining to whether Defendants participated in and/or benefited from any wrongdoing would be settled and never litigated again, either directly or indirectly.  A true and correct copy of the above-described email exchange is attached hereto as **Exhibit 11**.

    a.   On January 26, 2017, the undersigned Declarant wrote to Plaintiff's counsel:

> *The [Settlement] Agreement unambiguously precludes Dandong from bringing any future claims against the Settling Defendants*. . . . [If the change is made, then] the test for whether or not Dandong can bring a claim against a former CGTI employee who acted within the scope of his employment will be:  did the Settling Defendants benefit from the RICO Enterprise?  *That is the very question that we are settling, and the one that we are insisting that we not ever need to litigate again, <u>either directly or indirectly</u>.*

    (emphasis added).

    b.   In two subsequent emails in response, Plaintiff's counsel wrote:

> [Foregoing the change] is an invitation to litigation rather than *the final settlement we both wanted*. . . .  [T]he change opens the door to nothing, and certainly not to future litigation over whether [Defendants] . . . benefited from a purported RICO Enterprise.

    (emphasis added).

45.    The Parties executed the finalized Settlement Agreement February 14, 2017.  A true and correct copy of such Settlement Agreement is attached hereto as **<u>Exhibit 12</u>**.

**The May 8, 2017 Accountants' Meeting and Plaintiff's Unilateral Demand for US $103 Million in Re-Hashed Legal Claims**

46.    In accordance with the terms of the Settlement Agreement, the Parties mutually agreed to hold the meeting of their respective accountants via teleconference on May 8, 2017.

47.    On May 1, 2017, Plaintiff's counsel informed the undersigned Declarant that Plaintiff's accountant planned to present a PowerPoint Presentation at the May 8 accountants' meeting regarding Plaintiff's accounting review of the Soybean contracts payments and adjustments.

48.    Between May 1 and May 8, 2017, the undersigned Declarant made several oral and written requests to Plaintiff's counsel to provide Defendants in advance of the May 8 accountants' meeting a copy of the PowerPoint Presentation that Plaintiff's accountant intended

to present for the purposes of facilitating the upcoming discussion between the Parties' respective accountants.  True and correct copies of the email exchanges containing such written requests are attached hereto as **Exhibits 13, 14, and 15**.

49.     Defendants understand that Plaintiff's counsel spent nearly a week with Plaintiff's CFO formulating the PowerPoint Presentation, but Plaintiff refused to provide Defendants with a copy of the PowerPoint Presentation before the accountants' meeting, or to disclose its ultimate intention to not make a *bona fide* attempt to reconcile on an accounting basis the payments and adjustments made in respect to the Soybean Contracts at issue.

50.     Neither before nor at the accountants' meeting did the Plaintiffs exhibit any interest in reviewing the spreadsheet prepared by Defendants' accountant or working with Defendants to achieve the stated purpose of Paragraph 7 and the Settlement Agreement as a whole.  Instead, Plaintiff's CFO unilaterally presented the PowerPoint attached to the Declaration of H. Ruvoldt as Exhibit 4, which Presentation contained repeated legal claims and allegations of wrongdoing, and not an analysis and reconciliation of any accounting discrepancies in respect to the Soybeans Contracts at issue.

51.     Specifically, Plaintiff's re-hashed and re-asserted legal claims and allegations of wrongdoing (the "Disputed Claims"),[2] as presented in Plaintiff's CFO's PowerPoint Presentation, are based on ***twenty-three specific Soybean Contracts***.  Based on Plaintiff's re-assertion of settled legal claims, Plaintiff demanded nearly US $103 million for the very first time at the May 8 accountants' meeting.

52.     As detailed in the below chart, ***each one of the twenty-three Soybean Contracts*** on which Plaintiff's Disputed Claims are based was the subject of the Chinese Litigations (*see*

_____

[2] As in the accompanying Memorandum, this Declaration will refer to Plaintiff's claims for nearly US $103 million, which were unilaterally presented to Defendants in a PowerPoint Presentation at the May 8, 2017 accountants' meeting, and which are described in further detail in the chart in Paragraph 56, as the "Disputed Claims".

¶¶18–20, above), the June 2015 Agreement (*see* ¶¶21–23, above), and/or the RICO Complaint (*see* ¶28, above).

| | Contracts Giving Rise to Alleged Disputed Claims | Cited in RICO Complaint? | Cited in Chinese Litigations? | Cited in June 2015 Agreement? |
|---|---|---|---|---|
| 1 | 30007/A | X[3] | | X[4] |
| 2 | 30040/A | X | X | X |
| 3 | 30042/A[5] | | X | X |
| 4 | 30047/A | X[6] | X | X |
| 5 | 30054/A | | X | X |
| 6 | 30065/A | X | X | X |
| 7 | 30084/A | X | X | X |
| 8 | 30085/A | X | X | X |
| 9 | 30089/A | X | X | X |
| 10 | 30096/A | X | | |
| 11 | 30097/A | X | | |
| 12 | 30099/A | X[7] | X | X |
| 13 | 30139/A | X | X | X |
| 14 | 30145/A | X | X | X |
| 15 | 30164/A | | X | X |
| 16 | 30184/A | X | X | X |
| 17 | 30195/A | X | X | X |
| 18 | 30196/A | X | X | X |
| 19 | 30201/A | X | X | X |
| 20 | 30240/A | X | X | X |
| 21 | 30241/A | X | X | |
| 22 | 30244/A | X | X | X |
| 23 | 30281/A | X | X | |

53.     Not only are Plaintiff's Disputed Claims based on the same Soybean Contracts that formed the basis of Plaintiff's previous claims and settlements, but the underlying allegations of such Disputed Claims are also identical to Plaintiff's allegations in the Chinese Litigations and, specifically in the RICO Complaint, and, as such, are the very allegations that were settled, dismissed, and released under the Settlement Agreement.  *See* Exhibit 12, ¶¶1, 2, and 4.  The Disputed Claims set forth in Plaintiff's CFO's PowerPoint Presentation are divided

---

[3] *See* Related Case ECF No. 1, ¶¶60(a), 105, and 115(o)).
[4] *See* Exhibit 2, ¶4.
[5] Although Contract Nos. 30042/A, 30054/A, and 30164/A are not explicitly referenced in the RICO Complaint, they are listed in the Disputed Claims as "resold contracts".  The RICO Complaint alleges damages arising from such "resold contracts".  *See* Related Case ECF No. 1, ¶60.  As such, these three contracts are implicitly referenced in the RICO Complaint, and explicitly referenced in the Chinese Litigations ***and*** the June 2015 Agreement.
[6] *See* Related Case ECF No. 1, ¶115(g).
[7] *See* Related Case ECF No. 1, ¶60(b).

into eight categories of alleged damages, and a ninth category that seeks interest thereon. *See*

ECF No. 9, Ex. 3.  As is evident in the chart below, ***each and every "category" of alleged***

***damages was previously alleged by Plaintiff in the RICO Complaint***.

| Category of Damages | Allegations in the RICO Complaint |
|---|---|
| Category One: Claims arising from thirteen specific executed contracts and five specific resold contracts; and claims arising from a refund of US $5 million that was allegedly wrongfully diverted to an entity other than Plaintiff. | Plaintiff's claims in the RICO Complaint arose from twenty-three Soybean Contracts, ***each identified by its contract number***. (RICO Compl., ¶42).  With respect to "resold contracts", the RICO Complaint alleged that "Defendants would falsely and fraudulently . . . sell the cargo to another buyer at a higher price." (Related Case ECF No. 1, ¶60).<br><br>In addition, Plaintiff alleged in the RICO Complaint that ***US $5 million was wired to an entity called China Market Development (HK) Ltd.*** instead of Plaintiff. (Related Case ECF No. 1, ¶15). |
| Category Two: Claims arising from resold contract No. 30007/A | As noted above, Plaintiff alleged in its RICO Complaint that, "[w]hen it benefited the Defendants . . . Defendants would . . . sell the cargo to another buyer at a higher price." (Related Case ECF No. 1, ¶60).  ***Contract No. 30007/A is explicitly referenced in the RICO Complaint as an example of a resold contract.*** (Related Case ECF No. 1, ¶60(A)). |
| Category Three: Claims arising from false invoices relating to Contract No. 30096/A (i.e., Plaintiff alleges in the PowerPoint that "CGTI showed a false Sunrise invoice to [Plaintiff.]") | In its RICO Complaint, Plaintiff alleged that "[t]he CGTI Defendants ***sent false invoices*** . . . which falsely represented that there were fees due." (Related Case ECF No. 1, ¶64) (emphasis added).  In fact, in the RICO Complaint, ***Plaintiff claims damages arising out of Contract No. 30096/A*** and explicitly lists Sunrise as the seller in Contract No. 30096/A. (Related Case ECF No. 1, ¶42). |
| Category Four: Claims arising from Contract No. 30097/A, which was allegedly diverted to DCGTI | In its RICO Complaint, Plaintiff alleges damages arising from Contract No. 30097/A and a company with "a name deceptively similar to CGTI[.]" (Related Case ECF No. 1, ¶64).   In fact, in the RICO Complaint, ***Plaintiff claims damages arising out of Contract No. 30097/A*** and explicitly lists DCGTI as the seller in Contract No. 30097/A. (Related Case ECF No. 1, ¶42). |
| Category Five: Claims arising from Contract Nos. 21200, 30281/A, and 30241/A (i.e., contracts on which Plaintiff defaulted and Defendants allegedly made a "futures trading profit") | ***Contracts Nos. 30281/A and 30241/A are explicitly referenced in Plaintiff's RICO Complaint*** as "Contracts Not Executed" (Related Case ECF No. 1, ¶42).  Contract 21200, as noted in the PowerPoint, does not involve CGTI, but rather appears to be a contract between Liaoning Gold Harvest Grain Co., Ltd. and FGDI, LLC. (ECF No. 9, Ex. 3). |
| Category Six: Claims arising from Hu's "Commissions", allegedly totaling $402,398.67. | In its RICO Complaint, Plaintiff alleged that, "[b]etween in or about July 2009 and on or about December 22, 2010, ***Pasternak Baum paid Gary Hu some $402,398.67 in 'commissions'***[.]" (Related Case ECF No. 1, ¶54) (emphasis added). |
| Category Seven: Claims arising from "Pricing Overcharges" | This precise allegation was the very subject of Plaintiff's RICO Complaint, in which Plaintiff alleged that Defendants "wrongfully ***manipulated the terms in each of these contracts so that the soybean prices, and thus profit, were significantly higher than market price***.  This manipulation resulted in Plaintiff paying many millions dollars more for soybeans than the market price." (Related Case ECF No. 1, ¶43) (emphasis added). |
| Category Eight: Claims arising from loss of supply chain | Plaintiff's Second Amended Complaint in the RICO Action, in a feeble attempt to plead a domestic injury, states unequivocally that the loss of supply chain damages arise exclusively from the wrongdoing set forth in the RICO Complaint. (Related Case ECF No. 73, ¶¶111–24). |

54. At the end of the PowerPoint Presentation, the undersigned Declarant objected in no uncertain terms to Plaintiff's bad-faith, after-the-fact attempt to purposefully distort and misuse the language of Paragraph 7 and the intent of the Parties, in respect to an accounting exercise, in order to re-assert legal claims that had been settled, dismissed, and released merely a few months earlier.

55. Given Plaintiff's conduct, and the conduct of its counsel, and their failure to abide by the terms of Paragraph 7 in respect to the accountants' meeting and the joint review of each of the payments made under the Soybean Contracts at issue, the undersigned Declarant made it clear that Defendants would not submit to accountants for adjudication Plaintiff's non-accounting, re-asserted settled legal claims.

56. Plaintiff then filed the current action against Defendants on June 16, 2017, seeking various orders of specific performance and/or injunctions directing Defendants to comply with Plaintiff's interpretation of the terms of the Settlement Agreement and Paragraph 7 therein, as well as a monetary judgment to compensate Plaintiff for alleged damages and an order disgorging Defendants' alleged enrichment. *See* ECF No. 1, pp.10–11.

57. The Court ordered the Parties to appear at a Status Conference on July 6, 2017. A transcript of such Conference is attached hereto at **Exhibit 16**.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated: August 7, 2017            Respectfully submitted,


           /s/ Michael G. Chalos
           **Michael G. Chalos**

16

# Tab "B"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANDONG OLD NORTH-EAST AGRICULTURE & ANIMAL HUSBANDRY CO., LTD., formerly known as DANDONG PASITE, | No. 17-4571 |
| Plaintiff, | Related to No. 1:15-cv-10015-KPF |
| -against- | |
| PASTERNAK, BAUM & CO., INC., COLUMBIA GRAIN TRADING INC., and WILLIAM C. GALLO, | |
| Defendants. | |

## <u>ORDER TO SHOW CAUSE</u>

AND NOW, upon consideration of Plaintiff's Motion by Order to Show Cause to Enforce Paragraph 7 of the Parties' Settlement Agreement and to Compel Defendants' Compliance with Same (the "Motion"), the Declaration of Harold J. Ruvoldt, Esquire in Support of the Motion and all exhibits annexed thereto, and Plaintiffs' Memorandum of Law in Support of the Motion,

IT IS HEREBY ORDERED that Defendants PASTERNAK, BAUM & CO., INC., COLUMBIA GRAIN TRADING INC. and WILLIAM C. GALLO shall appear before the Court on the ___ day of June, 2017, at _____ o'clock a.m./p.m., to show cause why the Court should not enter one or more order granting all or some of the following relief:

> A. An order of specific performance directing Defendants to comply immediately with all terms of the Settlement Agreement including, without limitation: (i) resuming the meetings of the designated accountants, (ii) participating in the meetings in good faith, (iii) concluding those meetings on or before July 8, 2017, unless Dandong agrees to extend that date, and (iv) selecting a third-party accountant in the event that the designated accountants cannot reach an accord.

1

B.  An order of specific performance and/or an injunction commanding Defendants to comply with and/or enjoining Defendants from violating the term of the Settlement Agreement making the determination of the designated accountants or the third-party accountant final and non-reviewable in any court.

C.  An order of specific performance and/or an injunction commanding Defendants to comply with and/or enjoining Defendants from violating the term of the Settlement Agreement obligating them to pay in full within ninety (90) days of the issuance of a written determination from the designated accountants or third-party accountant all monies owed to Plaintiff.

D.  An order extending this Court's exclusive jurisdiction over Defendants' compliance with the terms and conditions of the Settlement Agreement until such time as Defendants have performed fully each and every obligation thereunder.

E.  Such other and further relief as is proper and just.

IT IS FURTHER ORDERED that service of the Motion and accompanying papers upon Defendants' counsel Michael Chalos, Esquire of the law firm K&L Gates LLP by email or other method to be delivered on or before June ___, 2017, shall be deemed good and sufficient service.

IT IS FURTHER ORDERED that responding papers, if any, shall be filed with the Court and served on Plaintiff's counsel so as to be received on or before June __, 2017.

IT IS FURTHER ORDERED that reply papers, if any, shall be filed with the Court and served on Defendants' counsel so as to be received on or before _____, 2017.

Dated:  June __, 2017

SO ORDERED:

_____
Hon. Katherine Polk Failla, USDJ

2

Harold J. Ruvoldt, Esq. (HR6556)
FlemIng Ruvoldt, PLLC
1700 Broadway, 28th Floor
New York, New York  10019
(212) 706-1850
Counsel for Plaintiff


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DANDONG OLD NORTH-EAST AGRICULTURE & ANIMAL HUSBANDRY CO., LTD., formerly known as DANDONG PASITE,<br><br>                          Plaintiff,<br><br>    -against-<br><br>PASTERNAK, BAUM & CO., INC., COLUMBIA GRAIN TRADING INC., and WILLIAM C. GALLO,<br><br>                          Defendants. | No. 17-4571<br><br>Related to No. 1:15-cv-10015-KPF |


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION**
**BY ORDER TO SHOW CAUSE TO ENFORCE PARAGRAPH 7 OF**
**THE PARTIES' SETTLEMENT AGREEMENT AND TO COMPEL**
**DEFENDANTS' COMPLIANCE WITH SAME**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................1

FACTUAL BACKGROUND ......................................................................3

ARGUMENT .............................................................................................6

    I.    Public Policy Considerations Compel Summary Enforcement
         of Settlement Agreements ........................................................6

    II.   This Court Should Specifically Enforce the Accountant-Driven
         Resolution Process .................................................................8

    III.  Swift Action Is Needed ..........................................................12

CONCLUSION ........................................................................................13

# TABLE OF AUTHORITIES

Adsit v. Wal-Mart Stores, Inc., 79 A.D.3d 1168 (3d Dep't 2010) ................................7

American Mills Co. v. American Surety Co. of N.Y., 260 U.S. 361 (1922) ..................9

AMF Inc. v. Brunswick Corp., 621 F. Supp. 456 (E.D.N.Y. 1985) ....................8-9, 12

Aquila v. Rubio, 51 Misc.3d 1217(A) (Sup. Ct. Suffolk Cty. 2016) ...........................8

Cruz v. Korean Air Lines Co., 838 F. Supp. 843 (S.D.N.Y. 1993) ..............................7

Denburg v. Parker Chapin Flattau & Klimpl, 82 N.Y.2d 375 (1993) ...........................7

International Minerals and Resources, S.A. v. Pappas, 96 F.3d 586 (2d Cir. 1996) .....................7

Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714 (2d Cir. 1974) ...........7, 13

Powell v. Omnicom, 497 F.3d 124 (2d Cir. 2007) ......................................................9

Renaissance Search Partners v. Tirenaissance Ltd., No. 12 Civ. 5638(DLC),
    2013 WL 8640109 (S.D.N.Y. Dec. 13, 2013) ......................................................7

Weiss v. Columbia Pictures Television, Inc., 801 F. Supp. 1276 (S.D.N.Y. 1992) .....................2

## PRELIMINARY STATEMENT

In February, 2017, Dandong Old North-East Agriculture & Animal Husbandry Co., Ltd.,
formerly known as Dandong Pasite ("Dandong") entered into an agreement (the "Settlement
Agreement") with Pasternak, Baum & Co., Inc.  ("Pasternak"), Columbia Grain Trading Inc.
("CGTI'), and William C. Gallo ("Gallo" and together with Pasternak and CGTI the "Settling
Defendants") pursuant to which Dandong agreed to resolve claims against the Settling Defendants,
including those Dandong had brought in a legal action pending in this Court at Civ. A. No. 1:15-
cv-10015-KPF and captioned *Dandong Old North-East Agriculture & Animal Husbandry Co.,
Ltd. v. Hu et al.* (the "Action").[1]  The claims in the complaint against the Settling Defendants in
the Action generally related to the purchase and sale of soybeans under certain contracts (the
"Soybean Contracts") and payments made pursuant to such contracts.  See Ex. 2, Settlement
Agreement, Recitals.

The Settlement Agreement, which was reduced to writing and signed by Dandong and the
Settling Defendants (together, the "Parties"), sets forth the terms, conditions and obligations
pursuant to which the Parties settled the Action.  Among other things, in exchange for a dismissal
and release of claims, the Parties agreed to a process by which it would be determined what monies
the Settling Defendants owe to Dandong (or vice versa) "related to their business relationship
concerning the Soybean Contracts, taking into account any and all payments made to date between
the Parties." Id. ¶ 7 (emphasis added).  Essentially, the Settlement Agreement obligates the
corporate parties (Dandong, Pasternak and CGTI) to designate accountants who must hold
meetings to review and determine the amount of monies owed.  Id.  If the Parties' designated
accountants are not able to reach an agreement as to what monies are owed, then the Parties agreed

---

[1] The Action is still pending against other, non-settling defendants.

1

that they will select a third-party accountant whose determination "shall be final and not reviewable in any forum." Id., ¶ 7(d).

After Dandong's designated accountant presented her calculations and backup materials to the Settling Defendants, in which she concluded that the Settling Defendants owe Dandong approximately $103 million (USD), the Settling Defendants' attorneys notified Dandong's attorneys that the Settling Defendants "decline to participate in a further meeting of designated accountants." See Ex. 6. Further, the Settling Defendants have refused to discuss the selection of a third-party accountant to make the final determination of the amount of monies owed. Indeed, the Settling Defendants' designated accountant has remained silent while the Settling Defendants have turned to their attorneys to continue arguing the merits of Dandong's claims. The Settling Defendants' actions run counter to the express obligations and purpose of the Settlement Agreement – namely, to put aside legal wrangling and to dedicate to the accountants the determination of the amount of monies owed.

As such, Dandong now returns to this Court seeking its aid in enforcing Paragraph 7 of the Settlement Agreement and compelling the Settling Defendants to comply with their plain obligations under the same. Dandong returns here not only because it is a proper forum under general jurisdictional and venue principles but also because the Parties agreed, under circumstances such as those presented here, that this Court would be the exclusive forum for seeking relief. See Ex. 2, Settlement Agreement ¶ 17 ("Exclusive jurisdiction for enforcement of this Agreement will remain with the Court for six (6) months from the date of this Agreement …."). Cf. Weiss v. Columbia Pictures Television, Inc., 801 F. Supp. 1276, 1278 (S.D.N.Y. 1992) ("The Second Circuit has expressed a strong policy favoring the enforcement of forum selection clauses").

For the reasons that follow, Dandong's Motion should be granted, and the Court should order the Settling Defendants to comply fully and in good faith both in the accountant process and in the meeting of corporate officers and all related disclosure obligations.

## FACTUAL BACKGROUND

The pertinent facts are quite simple.[2]  On or about December 23, 2015, Dandong commenced a legal action against the Settling Defendants and others, which was assigned to this Court.  In the Action, Dandong claimed damages (that is, monies owed) relating to the Soybean Contracts and the relationship among Dandong and the Settling Defendants regarding the same. See Ex. 2, Settlement Agreement, Recitals.  The Settling Defendants denied liability, and the case moved forward.  Eventually, Dandong and the Settling Defendants decided that it was in their best interest to resolve their dispute on business terms.  Accordingly, on or about February 10, 2017, they entered into the Settlement Agreement.  See Ex. 2, Settlement Agreement.  Therein, in exchange for Dandong's agreement to dismiss the Action and to release its claims against the Settling Defendants (but not others), the Settling Defendants agreed to institute an accountant-driven process to determine the monies, if any, owed to Dandong.  Id. ¶ 7.  The Settling Defendants also agreed to conduct a meeting of corporate officers during which Defendant Gallo, as President and CEO of Pasternak and CGTI, would answer any questions Dandong may pose "regarding the activities of Gary Hu, the Remaining Defendants [in the Action] and others, including the Settling Defendants, in respect to Gary Hu, the Remaining Defendants, and others, including the Settling Defendants, in respect to Gary Hu's employment with the Parties and to the business dealings between them and the Soybean Contracts."  Id. ¶ 8.

---

[2] The facts are taken from the Declaration of Harold J. Ruvoldt, Esquire and accompanying exhibits (the "Ruvoldt Decl.") submitted in support of Plaintiffs' Motion by Order to Show Cause to Enforce Paragraphs 7 and 8 of the Parties' Settlement Agreement and to Compel Defendants' Compliance with Same (the "Motion").

Paragraph 7 of the Settlement Agreement states, in its entirety, as follows:

Meeting of Designated Accountants.  On March 15, 2017 or at such other time as may be mutually agreed to by the Parties, the designated accountant(s) of Pasternak and CGTI shall meet with the designated accountant(s) of Dandong via videoconference, or at such location as may be mutually agreed to by all the Parties. The purpose of this meeting shall be to review and determine if any monies are owed to or from any of the corporate Parties hereto (i.e., CGTI, Pasternak, and/or Dandong) related to their business relationship concerning the Soybean Contracts, taking into account any and all payments made to date between the Parties.

a.  The above-described meeting(s) between the designated accountants shall take place at a mutually agreeable time starting no later than two (2) months following the execution by the Parties of this Agreement, unless such period is extended by mutual agreement of all the Parties in writing.

b.  The designated accountants shall complete the review and determine if any monies are owed to or from any of the corporate Parties within two (2) months of the commencement of such meetings, unless such period is extended by mutual agreement of all the Parties in writing.

c.  Each Party agrees to act in good faith to expeditiously conclude the above-described review and determine if any monies are owed to or from any of the corporate Parties.

d.  In the event that the designated accountants are not able to reach an agreement as to what monies, if any, are owed to or from the corporate Parties, pursuant to Paragraph 7(b), then the Parties shall jointly select an independent, third-party accountant to review the relevant records.  The determination of such third-party accountant shall be final, and all costs associated therewith shall be borne equally between Dandong on the one hand and the Settling Defendants on the other.  The determination of the designated accountants or third-party accountant shall be final and not reviewable in any forum.

e.  Should the designated accountants or the third-party accountant determine that money is owed from one corporate Party to the other, then such monies shall be paid in full within ninety (90) days of the issuance of a written determination from the designated accountants or third-party accountant, as applicable.

f.  If any Party should breach this paragraph 7, then the aggrieved Party's exclusive remedy shall be to bring an action in accordance with the terms of paragraph 17 of this Agreement.  In such event, all other terms and conditions of this Agreement shall remain in full force and effect.

Case 18-1285, Document 58, 08/24/2018, 2375281, Page45 of 54

The designated accountants' review process began on May 8, 2017, when the Parties' designated accountants and other representatives held a meeting via Skype. The May 8, 2017 meeting proceeded as contemplated by the Parties, with Dandong's designated accountant making a presentation in which she gave her calculations of the monies owed to Dandong. Per Paragraph 7 of the Settlement Agreement, Dandong's designated accountant confined her calculations to the Soybean Contracts and the Parties relationship thereto. Indeed, her presentation specifically set forth the Soybean Contracts at issue and the basis of her calculations for those contracts. According to the calculations of Dandong's designated accountant, Pasternak and CGTI (the "Corporate Defendants") owe Dandong approximately $103 million (USD). See Ruvoldt Decl. ¶¶ 7-8; Ex. 3.

At the conclusion of Dandong's presentation, counsel for the Corporate Defendants informed Dandong that it disagreed with Dandong's calculations. The Parties adjourned the meeting to give the Corporate Defendants' designated accountant time to consider the presentation and the backup materials and to prepare a response. See Ruvoldt Dec. ¶ 9.

In breach of the Settlement Agreement, the Settling Defendants' designated accountant decided not to provide a response or to offer his own calculations and backup support. Instead, the Settling Defendants directed their attorneys to prepare and send legal objections. In their legal objections, the Settling Defendants' attorneys take the strange and untenable position that (i) even though the Settlement Agreement arose out of the Action, and (ii) even though the Settlement Agreement sets forth the terms under which the Parties agreed to resolve the claims; and (iii) even though the claims "relate to or arise from the Soybean Contracts;" and (iv) even though the Settlement Agreement sets forth a process for determining the amounts owed "concerning the Soybean Contracts" and the Parties' relationship vis-à-vis those contracts; that (v) the "amounts

owed" can bear no relationship whatsoever to the claims "Dandong has released ... under paragraph 4 of the Settlement Agreement" and dismissed pursuant to Paragraph 2 of the Settlement Agreement. <u>See</u> Ex. 6. Thus, the Settling Defendants assert that, rather than agreeing to dismiss its claims against the Settling Defendants in exchange for a process by which accountants would decide the amount of monies owed, Dandong instead agreed to release the Settling Defendants essentially *gratis*.

At the conclusion of their legal letter, the Settling Defendants' attorneys told Dandong that the Settling Defendants "decline to participate in a further meeting of designated accountants." <u>Id.</u> The Settling Defendants reaffirmed their refusal to participate in the contractual process by letter dated June 15, 2017. <u>See</u> Ex. 9. Moreover, the Settling Defendants have refused and rebuffed Dandong's requests to discuss the selection of a third-party accountant to make the final determination of the monies owed. Ruvoldt Decl. ¶ 13.

While the Settling Defendants are not obliged to accept the calculations of Dandong's designated accountant *in toto*, they <u>are</u> obligated to participate in the process in good faith and, if an agreement is not reached between the designated accountants, to submit the matter to a third-party accountant for final determination. <u>See</u> Ex.2, Settlement Agreement, ¶ 7. The Settling Defendants are not permitted under the Settlement Agreement to have their designated accountant remain mum while the Settling Defendants' attorneys continue to battle as if this matter were still before and to be decided by a court.

## **ARGUMENT**

**I.** **Public Policy Considerations Compel Summary Enforcement of Settlement Agreements**

It has long been recognized that settlement is a "positive force, indispensable to judicial administration" and, as such, once entered into a settlement agreement is "binding and conclusive."

Cruz v. Korean Air Lines Co., 838 F. Supp. 843, 845-46 (S.D.N.Y. 1993) (quoting Janneh v. GAF Corp., 887 F.2d 432, 435-36 (2d Cir. 1989)).  Consequently, a district court has not only the power but the duty to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it.  See Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974); Renaissance Search Partners v. Tirenaissance Ltd., No. 12 Civ. 5638(DLC), 2013 WL 8640109 *1 (S.D.N.Y. Dec. 13, 2013) ("A trial court has inherent power to enforce summarily a settlement agreement when the terms of the agreement are clear and unambiguous." (quoting Omega Engineering, Inc. v. Omega, S.A., 432 F.3d 437, 444 (2d Cir. 2005)).[3]

New York courts similarly have recognized that "[s]trong policy considerations favor the enforcement of settlement agreements." Denburg v. Parker Chapin Flattau & Klimpl, 82 N.Y.2d 375, 383 (1993).  Among the benefits settlement agreements confer are the avoidance of potentially costly, time-consuming litigation and the preservation of scarce judicial resources.  Id. "Moreover, there is a societal benefit in recognizing the autonomy of parties to shape their own solution to a controversy rather than having one judicially imposed." Id.  A settlement agreement also accords finality "upon which people can order their affairs." Id.  For these reasons, New York law promotes the routine enforcement of settlement agreements so that they do not become "gateways to litigation." Id.; see also Adsit v. Wal-Mart Stores, Inc., 79 A.D.3d 1168, 1169 (3d Dep't 2010) ("Stipulations of settlement are favored as a public policy matter and are 'generally binding on parties that have legal capacity to negotiate, do in fact freely negotiate their agreement and either reduce their stipulation to a properly subscribed writing or enter the stipulation orally

---

[3] In recognition of the Settlement Agreement's choice of law, Dandong relies on decisions from the state and federal courts of New York and the application of New York law.  See Settlement Agreement ¶ 17.  Accord International Minerals and Resources, S.A. v. Pappas, 96 F.3d 586, 592 (2d Cir. 1996) ("New York law is unambiguous in the area of express choice of law provisions in a contract.... '[A]bsent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." (quotation omitted)).

on the record in open court'" (internal citation omitted)); <u>Aquila v. Rubio</u>, 51 Misc.3d 1217(A) *4

(Sup. Ct. Suffolk Cty. 2016) (settlement agreements "are to be enforced with rigor and without a

searching examination of their substance particularly when, as here, the parties were represented

by attorneys" (internal citations omitted)).

     Moreover, public policy favors enforcement of the parties' choice to invoke alternatives to

litigation and will not disturb their determination that "a special ADR mechanism would serve

them better than litigation."  <u>AMF Inc. v. Brunswick Corp.</u>, 621 F. Supp. 456, 462 (E.D.N.Y.

1985).  As the <u>AMF</u> court recognized, such decisions "are encouraged by no less an observer than

the [former] Chief Justice of the Unites States," who opined that alternative dispute resolution

devices "are often superior to litigation 'in terms of cost, time, and human wear and tear.'"  <u>Id.</u>

(quoting Remarks of Warren E. Burger, Chief Justice of the United States, at the Twin Cities

Advisory Council of the American Arbitration Association, St. Paul, Minn., August 21, 1985).

These principles hold true whether the parties make that choice before or after a dispute arises.

## II.    This Court Should Specifically Enforce the Accountant-Driven Resolution Process

     Whether viewed as an agreement to arbitrate or simply a contract to use a confidential out-

of-court process to determine the amount of monies owed, the Settlement Agreement may be

enforced through the equitable remedy of specific performance.  <u>See</u> <u>AMF</u> at 460, 461 (the essence

of arbitration is an agreement to have a third party decide the dispute).  Such provisions are

commonly acknowledged as serving many laudable purposes, such as reducing the acrimony

associated with protracted litigation.  <u>Id.</u> at 462.  Moreover, when the parties have agreed to select

a person from a particular profession or industry to make the final determination, they have

expressed their expectation of the value to be derived from the particular experience and skill that

person brings to the dispute resolution.  <u>Id.</u>  For these reasons and others, courts have recognized

that legal remedies are not as appropriate or would not afford complete relief and, as such, specific performance is proper.  Id.

Indeed, the Settling Defendants expressly agreed that their breach of Paragraph 7 of the Settlement Agreement would cause Dandong "to suffer irreparable harm, namely harm for which monetary damages would be an inadequate remedy."  See Settlement Agreement, ¶ 12.  The Settling Defendants further agreed that if they breached one or more of their obligations under Paragraph 7, then Dandong "will be entitled to any applicable and appropriate equitable remedies, including injunctive relief or specific performance, in addition to and not in limitation of any other right or remedies available to [Dandong] at law or in equity."  Id.  Finally, the Settling Defendants "waive[d] any and all rights to object to the issuance of such equitable relief."  Id.  Courts have upheld similar waivers of rights.  See, e.g., American Mills Co. v. American Surety Co. of N.Y., 260 U.S. 361, 363 (1922) (holding defendants may waive objections to equitable relief).

Moreover, equity compels that conclusion that a "defendant who has obtained the benefits of a … termination of the litigation … cannot then be permitted to ignore such affirmative obligations" as are imposed by the settlement agreement.  Id. at 461-62 (quoting Berger v. Heckler, 771 F.2d 1556, 1569 (2d Cir. 1985) and citing New York state cases in accord).  Thus, any argument that an adequate remedy at law exists and specific performance cannot be ordered is, in the words of a sister court, "untenable."  Id. at 462.  See also cf. Powell v. Omnicom, 497 F.3d 124, 128 (2d Cir. 2007) ("When a party makes a deliberate, strategic choice to settle, a court cannot relieve him of that choice simply because his assessment of the consequences was incorrect.").

Here, the Settling Defendants' breach and refusal to engage in the contractually-defined process for determining the amount of monies owed reeks of buyer's remorse.  Powell, 497 F.3d at 127 (enforcing settlement and noting defendant "now has the legal equivalent of buyer's

remorse").  At their core, the Settling Defendants' "reasons" for refusing to complete the process explicitly set forth in Paragraph 7 of the Settlement Agreement for determining the amount of monies owed come down to the Settling Defendants' apparent belief that Dandong cannot assert any calculations that contain even a whiff of the damages claimed in the Related Action.  See Ex. 6.  Of course, this is not at all what Paragraph 7 of the Settlement Agreement states, nor is it a fair reading of the Settlement Agreement as a whole.  But even if it were – a contention that Dandong rejects outright – the Settling Defendants' only remedy is to assert those contentions *in the context of the resolution process*.  **The Settling Defendants cannot simply refuse to engage in the process at all**.

The absurdity of the Settling Defendants' argument can be seen clearly in the following analogy.  Consider that, rather than agreeing upon a process by which designated and/or selected accountants would subsequently decide the amount of the monies owed and the payment to be made, the parties agreed on the specific amount owed before executing the settlement agreement and set forth in the agreement the timing under which payment were to be made thereafter.  Then, after executing the settlement agreement and obtaining a stipulation of dismissal and release of claims, the defendant refused to pay the amount agreed upon, claiming that because the plaintiff had released all of the claims from the action giving rise to the settlement agreement the plaintiff no longer had any right to claim those monies are owed or to receive payment thereof.  In an action to compel enforcement of the settlement agreement, a court would not hesitate to order the defendant to pay the agreed-upon sum.

The result should be no different here.  By executing the Settlement Agreement, Dandong did not give up its right to recover the full amount of the monies it contends are owed "related to [the Parties'] business relationship concerning the Soybean Contracts."  To the contrary, Dandong

10

(and the Settling Defendants) merely agreed to substitute the process set forth in Paragraph 7 of the Settlement Agreement for a judicial determination of the monies owed.

Nowhere does Paragraph 7 restrict or limit the meeting of designated accountants to "a review and reconciliation of minor accounting discrepancies in respect to the Soybean Contracts" as the Settling Defendants now contend, see Ex. 6 at 2. Rather, Paragraph 7 states that the purpose of the meeting of designated accountants "shall be to review and determine if any monies are owed to or from any of the corporate Parties hereto (i.e., CGTI, Pasternak, and/or Dandong) related to their business relationship concerning the Soybean Contracts," see Ex. 2, Settlement Agreement ¶ 7, matters that, as the Settling Defendants repeatedly concede, were the subject of the underlying Action and were resolved through the *entirety* of the Settlement Agreement (including Paragraph 7), not just Paragraphs 2 and 4 (dismissal and release), as the Settling Defendants frivolously argue, see Ex. 6 at 2-3.

In any event, the objections interposed by the Settling Defendants' attorneys to the calculations by Dandong's designated accountant are factually faulty. Indeed, even the Settling Defendants' attorneys cannot square their position with the plain words of Paragraph 7. Compare, e.g., Ex. 6 at 4 ("Dandong's second category of alleged damages arises from Contract 300007/A") with Ex. 2, Settlement Agreement ¶ 7 (stating purpose of accountant meeting shall be to "determine of any monies are owed … concerning the Soybean Contracts").

Dandong fulfilled its contractual obligation by painstakingly reviewing and compiling accounting-based data concerning the Soybean Contracts and the Parties' relationship thereto and calculating the amounts owed. Dandong's designated accountant restricted her review to the areas covered by Paragraph 7 of the Settlement Agreement and, in fact, delineated in her presentation the specific Soybean Contracts to which the monies owed relate. See Ex. 3. Within days after this

11

presentation, Dandong provided the backup materials to the Settling Defendants. The Settling Defendants now owe Dandong an accounting response – not a lawyer letter disavowing the express terms and obligations of the Settlement Agreement. To the extent that the Parties' designated accountants are not able to resolve the matter themselves, then the Settling Defendants must submit the matter to a third-party accountant per the terms of the Settlement Agreement.

In sum, while the Settling Defendants may be suffering from "buyer's remorse" now that they have seen Dandong's calculations of the monies owed and the back-up material, they cannot be excused from their obligation to complete the process set out in Paragraph 7 of the Settlement Agreement including, if need be, submission of the matter to a third-party accountant whose determination of the amount owed will be final. <u>AMF</u>, 621 F. Supp. at 461-62 (a "defendant who has obtained the benefits of a … termination of the litigation … cannot then be permitted to ignore such affirmative obligations" as are imposed by the settlement agreement). If the Settling Defendants disagree with Dandong's calculations or the basis therefor, then they are free to prepare their own calculations and provide the back-up for those calculations. But the accountants, not the lawyers (and not this Court), must drive that process and ultimately decide the amount of monies owed.

## III.    **Swift Action Is Needed**

The Parties negotiated a timetable pursuant to which the amount of monies owed would be determined. <u>See</u> Ex. 2, Settlement Agreement, ¶ 7. Having held the first meeting of the designated accountants on May 8, 2017, by contract the Parties' designated accountants are obligated to complete their review (and, if possible, determination) by July 8, 2017. <u>Id.</u> at ¶ 7(b). Moreover, the Settlement Agreement commands the Parties to "act in good faith to expeditiously conclude the above-described review." <u>Id.</u> at ¶ 7(c). If the designated accountants do not reach an agreement then they must select a third-party accountant, and payment is to be made in full within ninety (90)

days of the issuance of the third-party accountant's issuance of a written determination.  Id. at ¶ 7(e).

The plain import of these provisions is the right of any party owed monies to obtain a final determination of the same and then to receive the monies owed, quickly and expeditiously.  By their actions, the Settling Defendants have interfered with these rights and are currently receiving a windfall in that they have unilaterally forestalled the time by which they must make payment in full to Dandong.

Accordingly, not only does the law more generally grant this Court the power and the duty to enforce summarily, on this Motion, the Settling Defendants' obligations under Paragraph 7 of the Settlement Agreement, see Meetings & Expositions, Inc. at 717, but the Court should act swiftly in order to give effect to the specific terms of the Settlement Agreement to which the Settling Defendants agreed to abide.

## CONCLUSION

If the Settling Defendants wanted to continue a legal dispute, then they should not have entered into the Settlement Agreement.  By executing the Settlement Agreement, however, they voluntarily abandoned an attorney-driven process in favor of the accounting process expressly set forth in Paragraph 7 of the Settlement Agreement.  The Settling Defendants cannot be permitted, by unilateral fiat, to eschew the very processes they voluntarily agreed to embark upon and complete by specified dates.  For all of these reasons, Plaintiffs' Motion should be granted in its entirety.

Dated:  June 16, 2017
        New York, New York

FLEMING RUVOLDT PLLC

By:   /s/ Harold J. Ruvoldt
      Harold J. Ruvoldt, Esq. (HR6556)
      1700 Broadway, 28th Floor
      New York, New York  10019
      Tel:  201.518.7878
      Fax:  212.706.1855
      Email:  hruvoldt@flemingruvoldt.com

      *Attorneys for Plaintiff*